[No. E012326. Fourth Dist., Div. Two. Sept. 26, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ANA AL-RAD LEVI GUINN et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.A, II.A, B, and C and III. under Discussion.

## COUNSEL

Michael B. McPartland and Cliff Gardner, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, and Robert M. Foster, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**DABNEY, Acting P. J.**—Defendants and appellants Ana Al-Rad Levi Guinn and Jamal Hussein Johnson appeal their convictions of murder (Pen. Code, § 187) and robbery (Pen. Code, § 211). Defendant Guinn was also charged with a special circumstance allegation that the murder was committed during the commission of a robbery. The special circumstance was found true. (Pen. Code, § 190.2, subd. (a)(17)(i).) An enhancement allegation that each defendant had personally used a deadly weapon (baseball bat) in the

commission of the offense was found true as to defendant Guinn, but not true as to defendant Johnson. (Pen. Code, §§ 1192.7, subd. (c)(23), 12022, subd. (b).) Defendant Johnson appeals.

Defendant Guinn, who was sentenced to life without possibility of parole on the special circumstance murder (LWOP), has appealed, primarily raising sentencing issues. Although Guinn was a minor at the time the events in this case occurred, he was found to be unfit for juvenile court proceedings on November 28, 1990. (Welf. & Inst. Code, § 707, subd. (b).)

FACTS

The charges arose out of the senseless bludgeoning to death of a 20-year-old Mexican man, Carlos Montes Ortega.[1]

I. *Prosecution's Case*

On October 19, 1990, Benita Hill[2] was 13 years old. On one or two occasions before October 19, 1990, she had gone to Riverside with her friend, fifteen-year-old Barbara "Peaches" Thomas. She had met some of Thomas's friends and even considered herself the girlfriend of defendant Jamal "Pinky" Johnson. Hill and "Peaches" Thomas went by bus to Riverside after school on October 19, 1990.

The two girls went to a bowling alley near 11th Street in Riverside, where they met "Peaches" Thomas's boyfriend, Tony "Kink Nasty" Avery, and another boy. After 15 to 20 minutes, the young people went to some apartment buildings on 11th Street. There was a gated courtyard between two of the apartment buildings where Thomas, Avery and their circle of friends liked to "hang out." They "hung out" there on that day for several hours, well into the evening.

Jesse Witt[3] had a first-floor apartment in one of the buildings facing the courtyard. He was able to see the group of young people in the courtyard. Other young people joined them, including defendant Guinn, who went by

---

[1]The victim, Carlos Montes Ortega, had identification giving his name in both American and Mexican name order. To avoid confusion, the trial court adopted the expedient of naming the victim as Mr. Ortega. For convenience, we do the same.

[2]The reporter at various times spells this name as Benita Hill or Bonita Hill. Presuming that the reporter correctly transcribed the witness's statement, the witness herself spelled her first name for the record at the time she testified as Benita.

[3]The reporter's transcript spells Mr. Witt's name "Jessie"; Mr. Witt did not spell out his first name for the record, but we elect to use the more common spelling "Jesse" for this witness's name.

the moniker "Buckshot," and defendant Johnson. Defendant Guinn was carrying a wooden baseball bat. He played around with the bat, banging it on the railing of the stairs inside the courtyard, or on the concrete steps, and smacking it into his hand. Defendant Guinn called the baseball bat his "little brother." While defendant Guinn was playing with the bat, Benita Hill heard him say he wanted to kill someone. Some of those present left for a period of time and returned with gin, orange juice and some Old English malt beer. Defendants and others were drinking alcohol until it was finished.

In the meantime, the victim, 20-year-old Carlos Montes Ortega, had come home from work to the apartment complex, where he shared an apartment with his brothers. Ortega had been in the United States only one month and spoke little English. Ortega and his brothers had dinner at approximately 7 p.m. on October 19, 1990. After dinner, Ortega decided to get the mail from the complex's mailboxes, located on 11th Street.

As Ortega walked toward the mailboxes, Valerine Warren[4] was on the balcony-walkway in front of her apartment in another apartment building on 11th Street. Warren's apartment was on the second floor and she commanded a view of 11th Street from the balcony-walkway. Warren could see, among other things, the group of mailboxes for the whole complex, which were located in front of her apartment. Warren knew defendants Guinn and Johnson because she had been introduced to them at the apartment of a neighbor, Beverly Fuller.

About the same time that Ortega was going to the mailboxes, approximately 7:30 p.m., defendant Guinn asked defendant Johnson to walk with him. They left the courtyard area between two of the apartment buildings and walked out onto 11th Street. Benita Hill went with them; she walked with defendant Johnson, holding his hand, a little behind defendant Guinn. Defendant Guinn still had the baseball bat with him. Defendants Guinn and Johnson, and Benita Hill, walked toward the apartment complex mailboxes; Ortega was approaching from the opposite direction. Benita Hill testified that defendant Guinn turned to defendant Johnson and she heard Guinn ask Johnson if he wanted "to jack this man." Defendant Johnson responded, "Yes" or "Yeah." The expression "to jack" means to rob in street parlance. Benita Hill then saw defendant Guinn walk up to Ortega, still carrying the baseball bat. Defendant Guinn asked Ortega, "Do you have any money?" Ortega answered, in broken English, that he did not have any money. Defendant Guinn then pushed Ortega in the chest; Ortega stumbled back, then turned and ran. Guinn chased Ortega and caught up with him near a tree

---

[4] The reporter spells this name variously as Valerine or Valerie. Again, the witness did not spell her first name for the record when she testified.

by one of the apartment buildings. Defendant Guinn raised the bat and struck Ortega in the head. Ortega fell to the ground. Defendant Guinn hit Ortega with the bat several more times as Ortega lay on the ground, trying to protect himself with his hands. Eventually, "Kink Nasty," Tony Avery, pulled defendant Guinn away, telling him to "get out of here." Benita Hill saw defendant Johnson bend over the victim's body and stand up with a wallet in his hands. Defendant Guinn asked how much money there was. Defendant Johnson replied, "Two dollars." Benita Hill saw defendant Johnson fold up the $ 2 and put them in his pocket.

Valerine Warren also described the events she saw from her balcony-walkway. Warren could see defendants Guinn and Johnson, and Benita Hill, as they first walked past Ortega. She then heard one of the men say, "What's up, cuz?" to Ortega. Warren then saw defendant Guinn, holding the bat, and defendant Johnson chase after Ortega. Benita Hill was following behind them. Defendants Guinn and Johnson caught up to Ortega near a tree. Ortega turned and was backing away. Warren saw defendant Guinn raise the bat and strike Ortega in the upper part of his body. Ortega fell and defendant Guinn continued to beat him with the bat. Ortega was trying to cover himself with his hands. Warren saw defendant Johnson also hit Ortega.

Another member of defendants' social group, Anthony "Ant Dog" Eddington, took the bat from defendant Guinn. Jesse Witt, who could hear the cracking sound of the bat hitting Ortega's head from his apartment, saw "Ant Dog" run into the courtyard and throw the baseball bat on a carport roof. When defendant Guinn left the scene, his pants were covered in blood. Defendant Johnson had blood on the band of his wrist watch.

Ortega's skull was fractured by the blows; he later died of the injuries. The beating was so savage that treating medical personnel thought that Ortega had a "through and through" gunshot wound to the head, or that he had been attacked with a machete. The next day, October 20, 1990, Benita Hill saw "Peaches" Thomas. Benita Hill told Thomas it was a shame that Ortega had been killed "for two f---ing dollars." On the same day, Valerine Warren saw defendant Guinn with Beverly Fuller. Warren overheard defendant Guinn tell Beverly Fuller that he "beat up a guy last night" and that it "didn't matter because he'd done three more." Someone called police and reported that the baseball bat was on top of one of the carports. A police officer recovered the bat, which had blood stains on it.

Although initially afraid, Valerine Warren did ultimately contact the police about the killing. On the strength of Warren's evidence, defendants were taken into custody and questioned separately.

Defendant Guinn at first said he was not there when the beating happened, saying that he had "got people to say I wasn't there." Defendant Guinn maintained initially that he did not know anything about the killing except what Beverly Fuller had told him, and that his girlfriend had taken him to meet his mother at the home of one of his mother's friends at 6:30 p.m. on the day of the killing, or that he was at home. When the investigating officer confronted defendant Guinn with statements that she knew he was involved, he eventually changed his story, saying that he had been present, but that he had not done anything to anyone. He described the incident, saying that he had been talking and drinking with friends near the gated area, and two of his "home boys" had beaten the victim, but he denied personally touching the victim.

When the investigating officer again accused defendant Guinn of lying, and told him that he had been seen with defendant Johnson and Benita Hill, defendant Guinn changed his story again. He denied hitting the victim with the bat, but admitted he "was gonna jack" the victim—"I was gonna beat him up and take his money." Defendant Guinn admitted telling the victim, "Give me your money," and that the victim had answered that he did not speak English. Defendant Guinn hit the man and then chased him when he ran. Defendant Guinn admitted hitting the victim, but claimed he had not hit the victim with the bat. Defendant Guinn denied intending to kill anyone. Defendant Guinn told police he did not know who had beat the victim with the bat.

When he could not get the police to believe his story, defendant Guinn changed it yet again, and this time shifted blame to defendant Johnson, saying that Johnson had beaten the victim with the baseball bat. Defendant Guinn claimed to have pushed defendant Johnson away from the victim because he was "[b]eatin' him too much." Defendant had tried to soak the bloodstains from his acid-washed jeans, but the stains did not come out. When defendant found out the day after the beating that the victim had died, he threw his jeans away in the trash.

Defendant Johnson was interviewed separately. Defendant Johnson initially denied having a "street name" of "Pinky," and denied participating in the beating. Defendant Johnson told police that he was at the home of a friend, "Scott," that night, but was unable to give "Scott's" full name or address. Ultimately, defendant Johnson told police that he, his girlfriend Benita Hill, and defendant Guinn were walking toward the bowling alley. Defendant Guinn had been drinking and was carrying the baseball bat. Defendant Johnson stated that defendant Guinn chased the victim, and that he (Johnson) chased after defendant Guinn. Defendant Johnson denied hitting or kicking the victim, and denied taking money from the victim.

## II. *Defense Case*

Defendant Guinn testified in his own behalf. He testified that he lied to the investigating detective during his taped interview when he admitted beating Ortega. He claimed at trial that he did not intend to rob Ortega, did not intend to kill Ortega, and did not hit Ortega with the baseball bat. Instead, he blamed defendant Johnson for the killing.

Defendant Guinn admitted having the bat with him in the courtyard and that he called it his "little brother." He was drinking while with his friends. He denied hitting anything in the courtyard with the bat, and claimed he had put the bat down and defendant Johnson picked it up. Defendant Guinn testified that he met Eric Walker in the carport area behind the courtyard, and that they smoked a PCP cigarette. Walker left, and defendant Guinn rejoined the group in the courtyard on the steps, where he smoked marijuana and resumed drinking alcohol. Defendant Guinn was feeling "high," "lost" and "edgy." When defendant Guinn, defendant Johnson and Benita Hill left the courtyard, defendant Johnson had the bat.

Once on 11th Street, defendant Guinn noticed Ortega walking toward him. The PCP made defendant Guinn confused and paranoid. When Ortega attempted to walk by defendant Guinn, Guinn said to him, "What's up, cuz?" When Ortega did not reply, defendant Guinn hit him with his fist. When Ortega turned and ran, defendant Guinn chased him and defendant Johnson followed. Defendant Guinn knocked Ortega down with a blow from his fist. Guinn claimed he saw defendant Johnson hit Ortega in the head with the baseball bat. After defendant Johnson had hit Ortega a couple of more times with the bat, Tony "Kink Nasty" Avery pulled them away and told them to leave.

Defendant Guinn claimed he lied to the investigating officer because he believed he would be in more trouble for smoking PCP than for being involved in the robbery and killing. Defendant Guinn admitted he never mentioned PCP during his interview with police, and also admitted he learned about the felony-murder rule after his police interview, but before he met Eric Walker in jail. Walker came in at trial to testify that he and defendant Guinn had smoked a PCP cigarette on October 19, 1990.

Beverly Fuller, who was 16 years old in 1990, testified for defendant Guinn at trial. She testified that she had been at Valerine Warren's apartment just before Warren went out to the balcony-walkway, and that Warren had been smoking marijuana and drinking alcohol that day. As Fuller left Warren's apartment to return to her own apartment, she saw defendant

Guinn, defendant Johnson and Benita Hill walking on 11th Street. According to Fuller, defendant Johnson was carrying the bat.

Fuller admitted, however, that she did not want to be at the trial. She further admitted that she did not, despite what she saw, come forward with any information to the police on the night of the beating, but walked away from police. When she was initially interviewed by the district attorney's investigator, she told the investigator that she had remained inside Valerine Warren's apartment when the beating took place. She was also interviewed once or twice by defendant Guinn's investigator, but she still did not mention that defendant Johnson was the one carrying the bat. In fact, Fuller did not remember seeing defendant Johnson with the bat until a third interview with defendant Guinn's investigator. Tiffany Robinson—a friend of defendant Guinn's—was also present at that interview and reminded Fuller that defendant Johnson had the bat. Only then did Fuller's story change to state that defendant Johnson was the one carrying the baseball bat.

Defendant Johnson did not testify in his own behalf.

The jury found defendant Guinn guilty of first degree murder (Pen. Code, § 187) and second degree robbery (Pen. Code, § 211), and found true a robbery-murder special circumstance (Pen. Code, § 190.2, subd. (a)(17)(i)). The jury also found true that defendant Guinn personally used a deadly weapon in the commission of each offense (Pen. Code, §§ 1192.7, subd. (c)(23), 12022, subd. (b)). The jury found defendant Johnson guilty of first degree murder and second degree robbery. The jury found defendant Johnson did not personally use a deadly weapon in the commission of the offenses.

Defendant Guinn was sentenced to state prison for a life term without possibility of parole for the special circumstances murder, plus a one-year consecutive term for the weapon enhancement. He also received a concurrent determinate term of three years on the robbery and a consecutive one-year weapons enhancement term, which were stayed. The court recommended defendant Guinn for housing at the California Youth Authority.

Defendant Johnson was sentenced to state prison for an indeterminate term of 25 years to life for the murder and a concurrent determinate term of 3 years on the robbery. The court recommended that defendant Johnson be housed at the California Youth Authority (Welf. & Inst. Code, § 1731.5, subd. (c)).

Both defendants now appeal.

DISCUSSION

I. *Defendant Guinn's Appeal*

A. *Instructions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Sentencing*

Defendant Guinn raises numerous related issues with respect to his sentence for special circumstance robbery murder.

1. *Cruel and Unusual Punishment—Guidelines for Sentencing.*

Penal Code section 190.5, enacted in 1990 and applicable to this case, provides in relevant part: "(b) The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstance[s] . . . has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, *shall* be confined in the state prison for life without possibility of parole *or, at the discretion of the court,* 25 years to life." (Italics added.)

Defendant Guinn first contends that Penal Code section 190.5 violates the Eighth and Fourteenth Amendments to the United States Constitution, and analogous provisions of the California Constitution, because it does not provide adequate guidelines to the court in choosing which punishment—life without possibility of parole (LWOP) or an indeterminate 25 years to life term—to impose on a 16- or 17-year-old juvenile adjudicated to have committed special circumstance murder. Thus, defendant Guinn appears to argue that, in the absence of specific guidelines, LWOP will be arbitrarily and capriciously imposed, in violation of the guarantees against cruel and unusual punishment. (Cf. *Furman* v. *Georgia* (1972) 408 U.S. 238, 238-240 [33 L.Ed.2d 346, 346-351, 92 S.Ct. 2726].)

We believe Penal Code section 190.5 means, contrary to the apparent presumption of defendant's argument, that 16- or 17-year-olds who commit special circumstance murder *must* be sentenced to LWOP, *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life. Our construction is based on the ordinary language and structure of the provision; in context, the word "shall" appears to be mandatory. In addition, this construction is consistent with the history of Penal

---

*See footnote, *ante,* page 1130.

Code section 190.5, enacted as part of Proposition 115, the "Crime Victims Justice Reform Act." Under the former law, youthful offenders were exempted from application of the death penalty provisions. They also were excluded from application of the special-circumstance proceedings under Penal Code section 190.4, so that murderers under age 18 tried as adults were subject neither to the death penalty nor to LWOP. (See *People* v. *Marquez* (1992) 1 Cal.4th 553, 582 [3 Cal.Rptr.2d 710, 822 P.2d 418].) Penal Code section 190.5 was amended specifically to make youthful offenders, who committed what would have been a death-eligible crime for an adult, subject to special circumstances and LWOP. The fact that a court might grant leniency in some cases, in recognition that some youthful special circumstance murderers might warrant more lenient treatment, does not detract from the generally mandatory imposition of LWOP as the punishment for a youthful special circumstance murderer. In the first instance, therefore, LWOP is the presumptive punishment for 16- or 17-year-old special-circumstance murderers, and the court's discretion is concomitantly circumscribed to that extent.

Moreover, we are mindful of the familiar principle that statutes should be interpreted to preserve their constitutionality if possible. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Statutes should also be construed with reference to the whole system of law of which they are a part. Courts will not infer a legislative intent that is capricious or unconstitutional if the statutory language admits of an alternative interpretation which would serve the statutory policy and render application of the law reasonable and just. (*County of Yolo* v. *Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1249 [7 Cal.Rptr.2d 647].) Section 190.5 is placed with other special circumstances provisions in a distinct statutory scheme—which statutory scheme already contains provisions relating to mitigating circumstances justifying leniency in a penalty determination. We are reluctant to construe section 190.5 to authorize the court to act arbitrarily and capriciously, based on the asserted lack of guidelines for exercise of the court's discretion, when part of the same statutory scheme provides just such guidelines.[6] We therefore conclude the factors stated in section 190.3 are available, to the extent

---

[6]Defendant Guinn argues that he was deserving of leniency because he did not have an extensive prior criminal record, because he was intoxicated on alcohol and PCP at the time of the offenses, and because he was convicted of first degree murder only because of the harsh effects of the felony-murder rule. The jury obviously disbelieved defendant's intoxication defense, which materialized only after he learned about the felony-murder rule, and he was tried and convicted equally on a theory of premeditated and deliberate murder. Defendant Guinn further suggests that the alleged lack of specific guidelines for choosing the more lenient punishment of 25 years to life allowed the court to refrain from exercising its discretion in his favor for reasons of racial or other prejudice. Defendant Guinn argues he

relevant to an exercise of discretion to grant leniency, as guidelines under section 190.5. Because those factors allow the court to take into account any mitigating circumstance which extenuates the gravity of the crime (factor (k)), by extension the criteria stated under California Rules of Court, rule 423, are also available as guidelines for the court's exercise of discretion.

Defendant claims that Penal Code section 190.5 is unconstitutionally dissimilar to any other penal statute. He argues that (1) the determinate sentencing law is valid because it provides detailed and specific criteria for selecting the aggravated, middle or mitigated term; and (2) other sections imposing indeterminate terms are constitutional because they are based on specific circumstances found true by the trier of fact (Pen. Code, § 209, subd. (a)) or based on the holding of a separate penalty phase hearing (citing Pen. Code, § 190.05). Defendant Guinn overlooks that he is presumptively subject to LWOP based on a specific circumstance (robbery-murder special circumstance) found true by the trier of fact.

We determine, in short, that Penal Code section 190.5 must be construed in a commonsense manner, consistent with other related provisions of the law. We decline to ascribe an absurd, unjust, capricious and arbitrary intent to the enactment. Accordingly, we hold that if the court exercises its discretion to impose the penalty of 25 years to life instead of LWOP under section 190.5, that exercise of discretion is circumscribed by sensible criteria relating to the question whether the circumstances warrant imposition of a more lenient punishment.

### 2. *Due Process Notice.*

Defendant Guinn next contends he was denied due process because he never received notice of the factors that would be considered by the court with respect to its decision whether to impose the less severe punishment. Defendant urges that, because there was no provision for a penalty phase trial, the factors listed in section 190.3 are inapplicable; similarly, he contends that, because the sentences available were indeterminate terms, the provisions of the determinate sentencing law do not apply. Therefore, he concludes, he did not know what factors would be considered.

We reject defendant's argument. We repeat that we do not construe section 190.5 to be unconstitutional; i.e., to permit arbitrary or capricious

"was black, and was a member of a poorer segment of society, making him a potential subject of prejudice. Thus, the more serious sentence may have been imposed due to either conscious or unconscious prejudice." There is nothing whatever in the record to bear out this preposterous suggestion.

exercise of discretion. Accordingly, the court's sentencing discretion is guided, in making a decision whether a defendant is deserving of leniency, by criteria logically relating to the questions of culpability, aggravation and mitigation. Although it is literally true, as defendant states, that, e.g., the provisions of the determinate sentencing law do not directly apply to an indeterminate sentencing proceeding, that is not to say that the concepts of mitigation embodied in the rules relating to determinate sentence selection have no applicability to other instances of possible mitigation. Plain common sense would have told defense counsel that the factors listed in section 190.3 and the mitigating circumstances listed in rule 423 are the normal and logical criteria for making any reasoned exercise of discretion whether a particular defendant is deserving of some leniency in sentencing. Defendant's counsel had ample notice of what is "mitigating," and of the facts which might inform the court's exercise of discretion in favor of the lesser sentence.

Moreover, to the extent defendant Guinn argues he was "*not* given any notice of what circumstances would be considered and was unable to prepare for any type of penalty phase hearing," the record belies this claim. Defense counsel specifically asked for guidance with respect to the factors the court would consider; the court notified defense counsel in writing that it would look to the aggravating and mitigating criteria set forth in rules 421 and 423 of the California Rules of Court. After the court's notification of the criteria it would consider, defense counsel requested and was granted a continuance precisely to prepare for the sentencing hearing. Defense counsel was thus able to offer evidence in mitigation at the sentence hearing, and in fact presented evidence of his personal background and circumstances, through a report and testimony of a psychologist, as well as the testimony of defendant's father and defendant's girlfriend in his behalf.

3.   *Penalty Phase Jury Trial.*

Defendant Guinn sought below to have the trial court declare Penal Code section 190.5 declared unconstitutional on the grounds already stated; i.e., that it did not provide guidelines for the exercise of the court's discretion to grant leniency. In the alternative, defendant asked for a penalty phase jury trial. The trial court denied the request.

Defendant Guinn renews this claim on appeal. He argues that Penal Code section 190.5 is ambiguous because it does not provide any specific procedure for determination of the penalty, and the determinate sentencing scheme—being literally inapplicable to sentencing to one of two indeterminate terms—was unavailable as a model for sentencing procedure. Further,

defendant contends (1) only two statutory sections provide for choices between nondeterminate terms (§ 190.3 for death or LWOP in a capital murder case and § 190.05 for LWOP or 15 years to life in case of second degree murder with a prior prison term for murder), (2) both sections 190.3 and 190.05 provide for a penalty phase jury trial, and (3) therefore, the "ambiguity" in section 190.5 mandates that a penalty phase jury trial should have been held here.

Not so. In both Penal Code section 190.3 and Penal Code section 190.05, the section provides for an equal choice between two penalties, and prescribes a procedure for submitting the selection of sentence—between the two equal choices—to a trier of fact. That is, Penal Code section 190.3 provides that the penalty for special circumstances first degree murder "shall be death or confinement in state prison for a term of life without the possibility of parole." Neither penalty has any preference, and must be decided by the trier of fact. Similarly, Penal Code section 190.05 prescribes that, for a second degree murder, if the murderer has served a prior prison term for murder, "[t]he penalty . . . shall be confinement in the state prison for a term of life without the possibility of parole or confinement in the state prison for a term of 15 years to life." Again, neither penalty has precedence, and is specifically to be decided by a penalty phase jury.

By contrast, Penal Code section 190.5 provides a presumptive penalty of LWOP for a 16- or 17-year-old special circumstances murderer, "or, at the *discretion of the court*, 25 years to life." (Italics added.) Penal Code section 190.5 does not involve two equal penalty choices, neither of which is preferred. The enactment by the People evidences a preference for the LWOP penalty. In addition, the statutory language expressly provides that any exercise of discretion to impose the more lenient penalty is to be performed *by the court*, and not by a jury. The trial court properly denied a penalty phase jury trial.

### 4. *Cruel and Unusual (Disproportionate) Penalty.*

Defendant Guinn next contends the punishment of LWOP, applied to one who was only 17 years old at the time of the offense, is disproportionately severe, and that it therefore constitutes cruel and unusual punishment in violation of the United States and California Constitutions.

He argues the sentence was disproportionate to him and to his offense because he was intoxicated with alcohol and PCP, because he was only convicted of murder because of the harsh effects of the felony-murder rule, because he had a limited prior record, because he was a minor at the time of

the offense, because he and defendant Johnson netted only $2 from the robbery (assertedly showing a lack of sophistication), and because the LWOP sentence means he will be in prison for this offense for the rest of his life.

The circumstances of the crime and of defendant Guinn himself fully justify imposition of the LWOP sentence. Although there was some evidence that defendant had been drinking alcohol before the offense, his conduct evidenced conscious action in intending to rob the victim, soliciting defendant Johnson's agreement, personally challenging, chasing and attacking the victim, disposing of the weapon afterwards, fleeing, and attempting to get rid of his bloodstained pants; when the blood stains would not wash out, defendant Guinn then disposed of the pants. Further, defendant Guinn continuously lied to police about his involvement. Defendant Guinn first mentioned PCP intoxication, and produced a witness to testify to PCP use, only after he found out about the felony-murder rule. There was no significant or believable evidence of intoxication. Defendant was convicted of first degree murder on the theory not only of felony murder, but also as a premeditated and deliberate first degree murder. Defendant Guinn may have had a limited prior record, but he was only 17 years old at the time of the offense (and may not have had time to accumulate much of a record), he *had* committed at least one other similar offense in the recent past, and he was already on probation at the time of this murder. That defendants Guinn and Johnson netted only $2 for this crime does not support an argument of disproportionality; rather, this killing demonstrates the lengths to which defendant Guinn was willing to go and what he was willing to do to rob an innocent victim, without even knowing what he might recover. The fact that defendant Guinn had chosen to embrace an antisocial, savage, gang lifestyle of complete heinousness, callousness and utter disregard for the law or for the rights of others at a relatively early age does not demonstrate the disproportionality of the sentence. The senselessness of defendant Guinn's crimes makes them more, rather than less, deserving of punishment.

Defendant also relies on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] in support of his claim of disproportionality. His reliance is unavailing. Defendant Guinn was not comparable to the immature, previously nonoffending, teenager in *Dillon*. Dillon, a 17-year-old high school boy, had gone with some companions to steal marijuana from a marijuana farm. Dillon fatally shot a man who was guarding the marijuana crop. Dillon testified that he panicked and shot the victim because the man was armed, because Dillon believed he had just shot two of his friends, and because he believed the man was about to shoot him. Dillon's companions all received minor sentences in the incident, Dillon had no prior record, and

the jury had expressed some reluctance at finding Dillon guilty of first degree felony murder.

Here, by contrast, defendant Guinn was not panicked or threatened, he was in complete control of the situation and his own actions. He was unprovoked in any way and was the leader in instigating the crimes. Defendant Guinn's codefendant (Johnson) was not lightly punished, but was punished commensurately (25 years to life for the murder) with his lesser role in the crimes. Defendant Guinn was not a newcomer to the criminal scene, but had in the relatively recent past committed a similar strong-arm robbery, for which he was on probation at the time of these offenses.

■ Defendant Guinn argues that imposition of a sentence of LWOP on a 17-year-old is extreme. While we agree that the punishment is very severe, the People of the State of California in enacting the provision have made a legislative choice that some 16- and 17-year-olds, who are tried as adults, and who commit the adult crime of special circumstance murder, are presumptively to be punished with LWOP. We are unwilling to hold that such a legislative choice is necessarily too extreme, given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders, which undoubtedly spurred the enactment.

■ We cannot say that defendant Guinn's LWOP sentence was disproportionate either to his crime or to his personal culpability, based on his circumstances and characteristics.

*5. Reliance on Erroneous Information in Selecting Sentence.*

■ Defendant Guinn next contends the trial court improperly chose LWOP as the sentence because it mistakenly believed he would be released in 12 years or less if the court imposed the term of 25 years to life.

The court found, as circumstances in mitigation, defendant's age, that defendant had the support of his father and his girlfriend, and some indications that defendant Guinn wished to apply himself to better his education. In aggravation, the court considered the seriousness of this cold-blooded crime, the fact that defendant Guinn was on probation at the time of the offenses, the fact that the prior crime was a crime of violence, the pattern of violent conduct that was emerging in defendant's actions, that defendant Guinn acted without provocation, that defendant had armed himself beforehand with the baseball bat with intent to use it as a weapon, defendant's lack of remorse for the killing, defendant's leadership role in these crimes, and the planning and premeditation of the crime.

The court then stated, "Based upon all of those factors—and I've wrestled with this more than anyone can imagine. I feel that the only appropriate sentence based upon the alternatives that are left to me by the legislature where we lie to the public and tell them that we're sentencing someone to 25 years to life, and we all know working here at the courts that it can be 12 years, it might be 20 years, but very seldom is it ever 25 years. [¶] And the fact that, as [defense counsel] points out in his own points and authorities filed on behalf of Mr. Guinn, that Mr. Guinn could be released as early as 15 years, possibly less than that, that is not enough time for Mr. Guinn to spend in prison. [¶] This is a case, if the legislature would allow the courts to decree some additional factors or additional time beyond that that is allowed to us but possibly less than life without possibility of parole, there would be—that would be the alternative that I'm sure I would want to take. But given the choices that I have in this matter and based upon the factors set forth in 190.5 and the factors in aggravation and the factors in mitigation, I feel that the only sentence that I can impose for the murder with special circumstance in this case and understanding and knowing that it's going to be a tremendous pain for his father and for his fiance' and for his daughter also is to sentence the defendant to life without the possibility of parole . . . ."

Defendant now urges that the court made its decision to impose LWOP rather than 25 years to life based on the erroneous belief that defendant could be eligible for release in 15 years or less, or 12 years, whereas in fact defendant Guinn would not be eligible for parole until he had served 17 years, 3.6 months.[7] Defendant Guinn characterizes the court's remarks to mean that, if the court had the ability to sentence defendant to a term greater than 12 years, it would have chosen 25 years to life, but because it erroneously believed defendant could be released in 12 years, it chose LWOP.

Defendant misunderstands the import of the court's statements. The court did not choose LWOP because it believed defendant Guinn could be released in 12 to 15 years. Rather, the import of its statement was that a sentence of 25 years to life was not realistically a sentence of 25 years. Clearly, the court desired to impose an irreducible sentence of 25 years *or more*. The choice of 25 years to life would not, in the court's view, have provided sufficient punishment given the defendant's culpability. In any event, the court did not find sufficient mitigating factors to warrant a grant of leniency (imposition

---

[7]Defendant bases this figure on the following calculation: A life prisoner does not earn work credits and must serve two-thirds of the minimum sentence (e.g., 25 years based on the term of 25 years to life, plus 1 year for the enhancement). Thus, 25 plus 1 is 26; ⅔ of 26 years is 17.3 years, or 17 years, and 3.6 months. (See Pen. Code, § 2933, subd. (e); *In re Oluwa* (1989) 207 Cal.App.3d 439, 444-445 [255 Cal.Rptr. 35].)

of 25 years to life), and so imposed the presumptive sentence of LWOP. There is no reasonable or realistic chance that the possibility that defendant Guinn might serve 17 years, rather than 12 or 15 years, before being eligible for release would have affected the court's determination. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 6. *Reliance on Determinate Sentencing Factors.*

■ Finally, defendant Guinn urges that the court improperly relied on determinate sentencing mitigating and aggravating circumstances, when the determinate sentencing law is inapplicable to indeterminate sentencing. The point is not well taken. We have construed Penal Code section 190.5 to require a proper exercise of discretion in choosing whether to grant leniency and impose the lesser penalty of 25 years to life for 16- or 17-year-old special circumstance murderers. The choice whether to grant leniency of necessity involves an assessment of what, in logic, would mitigate or not mitigate the crime. The factors listed in rules 421 and 423, implementing the determinate sentencing law, do not lose their logical relevance to the issue of mitigation merely because this is not a determinate sentencing matter. As we held, *ante*, at page 1145, the special circumstances provisions, including section 190.3, provide for a number of factors which can be considered in selecting a penalty; by extension of factor (k), the kinds of mitigating and aggravating circumstances set forth in the determinate sentencing guidelines are also proper criteria in evaluating whether sentencing leniency should be granted.

### II. *Defendant Johnson's Appeal*

### A.-C.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Constitutionality of Reasonable Doubt in CALJIC No. 2.90 as to Both Defendants.\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

None of defendant Guinn's contentions has merit. The judgment as to defendant Guinn is affirmed. The judgment as to defendant Johnson is also affirmed; his sentence on the robbery count must be stayed pursuant to Penal

---

*See footnote, *ante*, page 1130.

Code section 654, and the trial court is directed to issue an amended abstract of judgment staying the robbery count and to provide a copy of the amended abstract to the Department of Corrections.

Hollenhorst, J., and McKinster, J., concurred.

Appellants' petitions for review by the Supreme Court were denied January 5, 1995.