Filed 10/30/14  In re Murray CA2/8
Opinion following remand from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re | B253237 |
| | (Super. Ct. No. KA074614) |
| CHRISTOPHER MURRAY | |
| on Habeas Corpus. | |

ORIGINAL PROCEEDING.  Petition for a writ of habeas corpus. Bruce F. Marrs, Judge.  Petition granted.  Judgment reversed and remanded with directions.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Larry Daniels and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Christopher Murray filed a petition for writ of habeas corpus, challenging as unconstitutional the life without parole sentence he received after being convicted of homicide offenses he committed when he was a juvenile. We issued an order to show cause why that sentence should not be reversed. We granted the petition and reversed the judgment so the trial court could resentence Murray in accord with the principles enunciated in *Miller v. Alabama* (2012) 567 U.S. ___, 132 S.Ct. 2455 (*Miller*). The California Supreme Court granted the People's petition for review, vacated our decision, and directed us to reconsider the matter in light of *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). After doing so, we conclude our prior opinion comports with the Supreme Court's decision in *Gutierrez* , and we once more reverse the sentence and remand for resentencing pursuant to *Miller* and *Gutierrez.*

## FACTS AND PROCEDURAL HISTORY[1]

On April 3, 2006, 17-year-old Christopher Murray shot and killed Christopher Trevizo and Demetries Flores, and shot at but missed Flores's brother Damon. Accompanying Murray were Angelo Vasquez and Salvador Villanueva, who pointed guns at each of the Flores brothers, but fired no shots. Murray was angry at Trevizo because Trevizo stole marijuana from Murray at gunpoint a few months earlier. Murray and his companions confronted Trevizo and the Flores brothers after following them as they walked along a secluded wash.

Murray was charged as an adult and entered an open plea of no contest to the first degree murders of Trevizo and Demetries Flores, and to the attempted murder of Damon Flores, subject to a trial on the issue of whether he was insane when the crimes occurred. After the jury found Murray had been sane, the trial court imposed the following

---

**1** Our statement of facts is taken in large part from the third of our three previous decisions in this matter. (*In re Murray* (Dec. 20, 2013, B223024) [nonpub.opn.] (*Murray III*).)

2

sentence: As to each of the two murder counts, life without parole (LWOP) because multiple victims meant they qualified as special circumstances murders (Pen. Code, §§ 190.3, subd. (a)(3), 190.5, subd. (b)), plus another 25 years to life for a firearm use enhancement (Pen. Code, § 12022.53, subd. (d)); as to the attempted murder count, the upper term of nine years (Pen. Code, § 664, subd. (a)), plus 20 years for another firearm use enhancement (Pen. Code, § 12022.53, subd. (c)). Each term was consecutive to the others.[2]

Murray appealed. We rejected his claim that the trial court should have excused a juror for harboring prejudice against the sanity defense, and that his trial lawyer was ineffective for failing to challenge that juror. We reversed and remanded for re-sentencing because multiple murder special circumstances (§ 190.2, subd. (a)(3)) had been improperly imposed for each murder conviction (*People v. Danks* (2004) 32 Cal.4th 269, 315), and because it was unclear whether the trial court had exercised its discretion under section 190.5, subdivision (b) in choosing life without parole for the murder counts instead of sentences of 25 years to life (*People v. Murray* (May 11, 2009, B20344) [nonpub. opn.] (*Murray I*)).

On remand for re-sentencing, the trial court struck the second special murder circumstance. It re-sentenced Murray to: life without parole on the first murder count, with a consecutive 25 years for the gun use enhancement; a consecutive term of 25 years to life on the second murder count, plus another consecutive 25 years for the gun use enhancement; and the consecutive high term of 9 years for the attempted murder count, plus another consecutive 20 years for the other gun use enhancement.

Murray appealed again, contending that because he was a minor when the crimes occurred, the LWOP sentence for one murder count violated his state and federal

---

[2] Vasquez and Villanueva were convicted as aiders and abettors of the murders of Trevizo and Demetries Flores, and of the attempted murder of Damon Flores, and we affirmed those judgments. (*People v. Vasquez* (May 6, 2010, B205698) [nonpub. opn.].)

All further undesignated section references are to the Penal Code.

constitutional protections against cruel and unusual punishment. He also contended that even if the LWOP sentence were reduced to a term of 25 years to life, he would still face a de facto sentence of life without parole that is constitutionally prohibited.[3]

We affirmed the judgment, holding that under the then-current state of the law LWOP sentences were constitutional for minors convicted as adults of murder. (*People v. Murray* (Feb. 6, 2012, B223024) [nonpub. opn.] (*Murray II*).) Four months later, the United States Supreme Court issued its decision in *Miller, supra,* 132 S.Ct. 2455, which held that the Eighth Amendment to the United States Constitution prohibits a sentencing scheme that mandates imposition of an LWOP sentence on a juvenile convicted of murder. (*Id.* at p. 2649.)

In response to the *Miller* decision, Murray filed a document styled as a "REQUEST TO RECALL THE REMITTITUR OR FOR WRIT OF HABEAS CORPUS," asking that we declare the LWOP sentence unconstitutional because he was sentenced under a statute that did not comply with *Miller*, and remand for a new sentencing hearing. Respondent contended that we could not recall the remittitur, but agreed we had discretion to treat Murray's brief as a petition for a writ of habeas corpus. We issued an Order to Show Cause why such a writ should not be granted. After further briefing, we then granted the writ and directed the trial court to resentence Murray in accord with the principles articulated in *Miller, supra,* 132 S.Ct. 2455. (*Murray III, supra,* slip opn. at pp. 5-7.)

The California Supreme Court granted the People's petition for review (S216198), vacated our decision in *Murray III,* and directed us to reconsider the matter in light of *People v. Gutierrez, supra,* 58 Cal.4th 1354, which construed section 190.5 in a manner consistent with *Miller*. We now consider Murray's sentence as directed by *Gutierrez*.

---

**3**    Murray's second appeal raised several other grounds, which we rejected and which are not at issue here.

4

**DISCUSSION**

1.   <u>Miller</u> *Prohibits Mandatory LWOP Sentences For Juvenile Homicide Offenders*

In *Graham v. Florida* (2010) 560 U.S. 48, 63-64, 81-82 (*Graham*), the United States Supreme Court announced a categorical rule prohibiting no-parole life sentences for minors who were convicted of non-homicide offenses. *Graham's* holding was based on the following: (1) scientific studies showing fundamental differences between the brains of juveniles and adults; (2) a juvenile's capacity for change as he matures, which shows that his crimes are less likely the result of an inalterably depraved character; (3) the notion that it is morally misguided to equate a minor's failings with those of an adult; and (4) the fact that even though non-homicide crimes may have devastating effects, they are cannot be compared to murder in terms of severity and irrevocability. (*Id.* at pp. 67-70.)

In *Miller, supra,* 132 S.Ct. 2455, the Supreme Court extended *Graham* and held that sentencing schemes that mandated LWOP sentences for juveniles who commit homicide offenses violated the Eighth Amendment's ban on cruel and unusual punishment. Under *Miller,* LWOP sentences are still permissible, but may be imposed on only the "rare juvenile offender whose crime reflects irreparable corruption." (*Id.* at p. 2469, citations omitted.) This determination must be made as part of a sentencing scheme that requires trial courts to take into account the "distinctive (and transitory) mental traits and environmental vulnerabilities" of children. (*Id.* at p. 2465.)

Mandatory LWOP sentences for juveniles "preclude[] consideration of [their] chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds [them] – and from which [they] cannot usually extricate [themselves] – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of [their] participation in the conduct and the way familial and peer pressures may have affected [them]. Indeed, it ignores that [they] might have been charged and convicted of a lesser offense if not for

5

incompetencies associated with youth – for example, [their] inability to deal with police officers or prosecutors (including on a plea agreement) or [their] incapacity to assist [their] own attorneys." (*Miller, supra,* 132 S.Ct. at p. 2468.) Accordingly, trial court sentencing of juvenile homicide offenders must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469.)

2.    Gutierrez *Construes Section 190.5 to Comply With* Miller

LWOP sentences for minors who commit first degree special circumstances murder when they are 16 or 17 are authorized by section 190.5, subdivision (b), which provides that in such cases the sentence "shall be confinement in the state prison for life without possibility of parole or, at the discretion of the court, 25 years to life." Beginning with *People v. Guinn* (1994) 28 Cal.App.4th 1130, the Courts of Appeal have construed this provision as supplying a presumption in favor of LWOP for juvenile offenders who were 16 or 17 years old when they committed special circumstances murder. (*Gutierrez, supra,* 58 Cal.4th at p. 1369, and cases cited therein.)

The *Gutierrez* court held that the judicially-created LWOP presumption violated *Miller* and that under the rules of statutory construction section 190.5 could be, and should be, construed to eliminate it. (*Gutierrez, supra,* 58 Cal.4th at p. 1387.) The *Gutierrez* court also held that pursuant to section 190.3, section 190.5 requires trial courts to consider the *Miller* factors when sentencing juveniles who commit special circumstances murders. (*Id.* at pp. 1387-1388.)[4]

Recapping *Miller*, the *Gutierrez* court said that trial courts must admit and consider evidence bearing on five factors:

---

[4]    Arguably, *Miller* should be read as having "flipped" the *Guinn* presumption into a presumption against LWOP by stating that it was the "rare" juvenile offender who would be eligible for an LWOP sentence and that the intrinsic differences between juvenile and adult minds "counsel against" LWOP sentences. That question is not before us, however, and some other court may have the opportunity to consider it.

First, the court must consider the defendant's age and its "hallmark features," which include immaturity, impetuosity, and failure to appreciate risks and consequences. Science has shown that these shortcomings are a feature of juvenile minds that both lessen a child's moral culpability and enhance the prospect that they will disappear as neurological development occurs over time. There is a difference between the juvenile offender whose crime reflects transient immaturity and the rare juvenile offender whose crimes reflect irreparable corruption. (*Gutierrez, supra,* 58 Cal.4th at p. 1388.)

Second, the court must consider evidence or other information in the record regarding the juvenile's home and family environment, from which he cannot usually extricate himself. Relevant evidence includes childhood abuse and neglect, family substance abuse, lack of adequate parenting and education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance. (*Gutierrez, supra,* 58 Cal.4th at pp. 1388-1389.)

Third, the court must consider evidence or information in the record regarding the circumstances of the offense, including the extent of the juvenile's conduct and the way that familial or peer pressures, or substance abuse, played a role in the juvenile's commission of the crime. (*Gutierrez, supra,* 58 Cal.4th at p. 1389.)

Fourth, the court must consider evidence or information regarding whether the juvenile might have been charged with and convicted of a lesser offense if not for incompetencies associated with youth, such as his inability to deal with police officers or prosecutors or assist in his own defense. (*Gutierrez, supra,* 58 Cal.4th at p. 1389.)

Fifth, the court must consider any evidence or information bearing on the possibility of rehabilitation because a child's character traits are less fixed and his actions less likely to represent irretrievable depravity. (*Gutierrez, supra,* 58 Cal.4th at p. 1389.)

The *Gutierrez* court summed up by holding that trial courts "must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1390, quoting *Miller, supra,* 132 S.Ct. at p. 2465.) "The question is whether [juvenile homicide

7

offenders eligible for an LWOP sentence] can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit to ever reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults." (*Id.* at p. 1391, quoting *Miller, supra,* 132 S.Ct. at p. 2464.)[5] Our Supreme Court repeatedly quoted *Miller's* admonition that LWOP sentences for juveniles would be "rare." (E.g., *Guttierez,* at pp. 1334, 1338.)

3.      *Remand For Resentencing Under* Miller *Is Proper*

A.

On remand we asked the parties to provide supplemental briefing in light of *Gutierrez.* Murray contends that resentencing is required so the trial court can start fresh in light of the principles articulated in *Miller.* Respondent contends resentencing is not necessary because, under *Gutierrez*, resentencing is not required if the record shows the trial court would have imposed the same sentence if it had been aware of the full scope of its discretion.

Anticipating the argument made in the present case, the *Gutierrez* court noted that remand for resentencing is required when a trial court is unaware of the scope of its discretionary powers "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1391, quoting *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.) The *Gutierrez* court ordered resentencing in the two cases before it because in one the trial court expressly referred to the *Guinn* presumption in favor of LWOP while in the other, although the trial court did not explicitly refer to that presumption, the prosecution's sentencing memorandum did. "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law," which at the time included *Guinn's* LWOP presumption. (*Gutierrez,* at p. 1390.)

---

[5]      The *Gutierrez* court noted that not every factor will be relevant in every case, such as where there is no indication in the record that a juvenile offender had a troubled childhood. (*Gutierrez, supra,* 58 Cal.4th at p. 1390.)

8

The trial court in this case resentenced Murray in March 2010, two months before *Graham* held that LWOP was not allowed for juvenile nonhomicide offenders and more than two years before *Miller*. Murray's sentencing memorandum relied on *Roper v. Simmons* (2005) 543 U.S. 551, which prohibited the death penalty for juveniles for reasons that were later adopted in both *Graham* and *Miller*. Murray argued that those factors applied to him even though his was not a death penalty case, and supported his sentencing memorandum with numerous letters from friends and family acquaintances about troubled aspects of his childhood and the fact that he acted out of fear of his victims.

The prosecution's sentencing memorandum relied on *Guinn, supra,* 28 Cal.App.4th page at 1141, arguing that section 190.5 "*mandates* that a 16 or 17 year old who is convicted of special circumstance murder *must be* sentenced to life without the possibility of parole unless the court finds good reason to choose the less severe sentence of 25 years to life." (Italics added.) The trial court did not mention *Guinn* or its presumption, but did set forth the factors it considered when imposing its LWOP sentence. These included the senselessness and circumstances of the crime, which the court described as "a cold blooded execution." The only mitigating factor the court found was Murray's lack of a criminal record, adding that it "realize[d] he was 17 at the time the crimes occurred."

Although Murray argued against an LWOP sentence based on the factors that would later be adopted in *Miller* and *Gutierrez*, and even though the trial court felt strongly that an LWOP sentence was warranted, we see nothing in the record that "clearly indicates" the trial court would have reached the same result had it applied the *Miller* factors. Instead, as in *Gutierrez*, the prosecutor cited *Guinn* as controlling authority for the proposition that an LWOP sentence was "mandated" unless the trial court found "good reason" to do otherwise. In accord with *Gutierrez*, we presume the trial court followed and applied the law that governed at the time, and therefore "cannot say with confidence what sentence [it] would have imposed absent the presumption." (*Gutierrez, supra,* 58 Cal.4th at p. 1391; *People v. Chavez* (2014) 228 Cal.App.4th 18,

9

33-34.) We therefore remand the case for resentencing in accordance with the principles set forth in both *Miller* and *Gutierrez.*

B.

Although we reject respondent's contention that remand is unnecessary because "the trial court made it abundantly clear that [Murray] would receive a sentence of LWOP even if the matter were remanded for resentencing a second time," we are concerned by the fervor and certainty of that statement. Not only have *Miller* and *Gutierrez* done away with *Guinn's* LWOP presumption, they have altered the trial court's decision-making landscape with a host of factors that must be considered when determining whether a juvenile homicide offender is the rare case justifying an LWOP sentence.

As we read the record, Murray's previous sentencing hearings were not conducive to implementing *Miller*. First, no probation report was prepared for Murray's initial sentencing hearing. Instead, a "non-appearance" probation report was prepared after sentencing that contained several inaccuracies: identifying Murray as Hispanic; listing his citizenship as unknown; and stating that he was a gang member.[6]

Second, the trial court mistakenly believed that the LWOP sentence was the result of a plea bargain that was automatically triggered by Murray's no contest plea and the subsequent determination of his sanity. Although we pointed out this misinterpretation in *Murray II*, we cannot say with certainty that the trial court's earlier assumption did not linger in its mind and color the exercise of its discretion.

Third, at the time of resentencing following our remand in *Murray II*, the trial court had letters of support from Murray's family and friends but refused to let any of them address the court in person. Although not necessarily required by the Supreme Court, a fair reading of *Miller* convinces us that it would be unusual to preclude a

---

**6** The non-appearance probation report is missing from the record. Respondent's supplemental brief acknowledges that the inaccuracies exist, but asks us to discount them. We rely on them only as examples of an absence of thoroughness in evaluating Murray.

reasonable number of friends and family to speak before an LWOP sentence is imposed. It is difficult to imagine how a trial court would find that a juvenile offender was that rare juvenile justifying an LWOP sentence without hearing from those best suited to know whether the juvenile is truly "irreparably corrupt."

Fourth, as discussed above, there is no indication that the trial court considered the *Miller* factors or chose to depart from the then-prevailing LWOP presumption.

Taken as a whole, these factors lead us to conclude that the trial court should start afresh, purging itself of the taint of *Guinn* by acting as though none of the earlier sentencing proceedings had taken place. While the trial court is not precluded from using evidentiary material already in the record, it must consider the *Miller* factors anew, keeping in mind the principle articulated in both *Miller* and *Gutierrez* that LWOP sentences are reserved for the rare, irreparably corrupt juvenile offender.

Although a probation report is not required because Murray is ineligible for probation (§ 1203, subd. (e)(1)) the trial court has discretion to order a probation report to investigate all the facts relevant to sentencing Murray. (§ 1203, subd. (g); *People v. Johnson* (1999) 70 Cal.App.4th 1429, 1432.) Furthermore, there is a preference for probation reports even when a defendant is ineligible for probation. (Cal. Rules of Court, rule 4.441(b).) Given the length of time that has passed and the constitutional importance of adherence to *Miller,* we urge the trial court to order a new probation report to assist its evaluation of the *Miller* factors. We also trust the trial court to exercise its discretion reasonably in regard to allowing statements from Murray's friends and family members.

Finally, although a statement of reasons is not statutorily required when a trial court imposes indeterminate sentences of 25 years to life or LWOP (§§ 1168, 1170, subd. (c); *People v. Neely* (2009) 176 Cal.App.4th 787, 798), the appellate courts do possess the inherent supervisory power to require a statement of reasons as a judicially declared rule of criminal procedure in appropriate cases. (*People v. Martin* (1986) 42 Cal.3d 437, 449; *Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 368.) Such a rule may be essential to meaningful appellate review, acts as an inherent guard against judicial oversights, and helps preserve public confidence in the decision making process

by showing the public that decision making is careful, reasoned, and equitable. (*Martin, supra,* at pp. 449-450.) We decline to impose such a rule in this case because the issue has not been raised by the parties, but believe that any future appellate review in this case would be enhanced if at the time the trial court resentences Murray it provides a statement of reasons that tracks the *Miller* factors. (See *Kennedy, supra,* at p. 369, fn. 3 [encouraging trial court to issue written statement of reasons when ruling on discovery motions even though one was not statutorily required].)

4.      *We Decline to Reach the De Facto LWOP Issue*

If the trial court does not impose an LWOP sentence on remand, it could, by running consecutively its previous sentence, impose a combined state prison term of 129 years, which clearly exceeds Murray's life span and would therefore constitute a de facto LWOP sentence.[7] (See *People v. Caballero* (2012) 55 Cal.4th 262, 268.) Murray asks us to hold that the trial court may not impose a de facto LWOP sentence without first satisfying *Miller*. This issue is currently pending before our Supreme Court. (*In re Alatriste*, review granted Feb. 19, 2014, S214652; *In re Bonilla*, review granted Feb. 19, 2014, S214960.) A petition for review is still pending in another decision that concerns this issue: *People v. Saetern* (2014) 227 Cal.App.4th 1456.

We believe this issue is best addressed in the first instance by the trial court, following briefing and argument by the parties. Furthermore, the issue may not arise at all if the trial court properly determines under *Miller* that either: (1) an LWOP sentence is proper; or (2) an LWOP sentence is not warranted and the trial court does not aggregate Murray's sentences in a way that converts them into a de facto LWOP. We therefore decline to address the issue at this time.

---

**7**      This could occur if the trial court imposed sentence as follows: consecutive sentences of 25 years to life for the two murder convictions, plus consecutive 25-year terms for the gun use enhancements that accompanied those charges; and a consecutive nine year term for the attempted murder count, along with 20 consecutive years for the accompanying gun use enhancement.

## DISPOSITION

Murray's sentence is reversed and the matter is remanded to the trial court with directions to resentence Murray in accord with the principles set forth in both *Miller* and *Gutierrez* and this opinion.



                                         RUBIN, ACTING P. J.

WE CONCUR:


        FLIER, J.


        GRIMES, J.

13