Filed 9/25/14  P. v. Pearson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C063484 |
| Plaintiff and Respondent, | (Super. Ct. No. 06F03704) |
| v. | |
| CALVIN PEARSON et al., | |
| Defendants and Appellants. | |

Though they assert the proof is insufficient, we conclude the evidence is overwhelming that the 16-year-old defendants, Calvin Pearson and Daniel Russell, targeted and savagely beat a partially blind and deaf 90-year-old woman to death.  What is left for us to unravel is a series of legal challenges to the admissibility of their confessions, the constitutionality and propriety of jury instructions on flight and accomplices, prosecutorial misconduct, and various sentencing issues.  Their challenges are unavailing, either because they have no merit or, in the context of the overwhelming evidence of guilt, they are harmless.  The Attorney General concedes that the parole revocation fines should be stricken.  The case is remanded to the trial court for resentencing in accordance with the guidance provided by the United States Supreme

1

Court in *Miller v. Alabama* (2012) ___ U.S. ___ [183 L.Ed.2d 407] (*Miller*) as we explain herein. In all other respects, we affirm the judgments entered on the guilty verdicts of murder, burglary, and robbery with two special circumstances, delivered by two separate juries following a joint trial.

## FACTS

Marie Oliver lived alone on Ellen Street in North Sacramento. She practiced her creed, providing small employment opportunities for young people in the neighborhood, like Russell. By Russell's own admission, Oliver was nice to him and paid him to do yard work for her, even going so far as to invite him into her home. He knew the layout of the house and the fact that she was partially blind and deaf.

Russell began his criminal career at the age of 10. By 16, he was a veteran thief and had served time in juvenile hall with another young thief, Pearson. There they plotted to rob Mrs. Oliver. They were released in approximately February or March of 2006. Conveniently, they were dating sisters, and although they lived in different parts of Sacramento, they spent time together on the weekends with their girlfriends.

On Tuesday, April 11, 2006, Russell and Pearson planned to break into Mrs. Oliver's house and rob her. They knocked on her front door, announced they were the police, and, when she did not open the door, they ran around to the back yard, looking for an open window. They used a ladder to climb onto the roof to look for a skylight entry. Russell was wearing his "Jordan" shoes at the time. He testified he picked up a pair of gloves he saw on the air conditioner and put them on before trying to force open the back door. Remembering Oliver's kindness, however, he claims he had a change of heart and thereafter talked Pearson into abandoning the burglary.

From here there are various versions of the story. Russell and Pearson told their interrogators different accounts at different times. And when they were brought into the same interrogation room, they modified their prior accounts. At trial, Russell gave a whole new story. We apply the cardinal rule of appellate review, that we must view the

2

evidence in the light most favorable to the prosecution. (*People v. Davis* (1995) 10 Cal.4th 463, 509.) We will describe the various confessions in more detail when discussing their admissibility.

On the night before Easter, Saturday, April 15, Russell and Pearson rode their bikes back to Mrs. Oliver's. Peering in through a window, they observed her watching television and having something to eat. Pearson went to the back door and Russell knocked on the front door. Pearson kicked in the door. One of them grabbed Mrs. Oliver and threw her to the floor. They both hit her before going through her house looking for money and jewelry. One or both of them beat her with her cane, and one of them covered her bloody face with a towel. They both wore gloves. When something fell and made a loud noise, they absconded. Mrs. Oliver was not moving.

Between them they had taken less than $100 in cash and a few pieces of jewelry. They asked a homeless man to buy them some alcohol, and they stopped to eat at McDonald's. Pearson took Ecstasy and, at some point later that night, blacked out. They left behind a treasure trove of forensic evidence at Mrs. Oliver's house.

Shoe impressions–castings and prints–were taken from the exterior of the rear door to her house, the back yard, inside the house, and in the bathroom. During their interrogation, a criminalist collected Russell's Jordan brand shoes and Pearson's K-Swiss brand shoes. The soles of Pearson's shoes matched the print found on Oliver's back door. His right K-Swiss shoe is similar to two of the shoe impressions from the back yard. The soles of Russell's Jordans were similar to prints left on a piece of cardboard inside the house and prints left in the bathroom. His right shoes could have made one of the impressions left in the back yard.

Bloodstains were found on both defendants' shoes and on both gloves found inside the house. They were submitted for DNA testing. Mrs. Oliver's blood was found on defendants' shoes and on the exterior of the gloves. It was also found on Russell's black sweatshirt. In addition, Russell's DNA was found inside the bloody gloves.

The pathologist's findings were grim. Mrs. Oliver suffered multiple blunt force injuries to the head and face. She had fractures to her nose, cheeks, the bone around her eye, and her ribs. These injuries could have been caused by punching, kicking, or being pushed into a blunt object. She had hemorrhages inside her eyes and eyelids, and tearing beneath her tongue. There were lacerations on the left side of her scalp that went to the bone and bleeding inside her scalp. She also had bruising on her head, face, and hands; inside her mouth; and covering both eyelids; and a rod- or stick-shaped bruise on her buttocks.

Police found two bicycles and a briefcase under the stairwell at Pearson's apartment. Inside the briefcase were Mrs. Oliver's canceled checks.

Pearson and Russell were interviewed together and admitted their participation in Mrs. Oliver's killing. They recalled riding their bicycles to Mrs. Oliver's house, after which, according to Russell, he knocked on the front door and then they both ran around to the rear door. Pearson kicked in the door and then Russell entered, threw Mrs. Oliver on the floor, and held her down. Russell admitted hitting her four or five times and stated that Pearson hit her with a cane. They hit her in the face. Russell stated he later put water on her face to see if she was still alive. Pearson took her briefcase, and Russell took "stuff" from her purse. Russell took her rings but did not remember what he did with them. They took money and, after leaving, gave a "bum" $20 to buy alcohol for them.

Russell testified on his own behalf; Pearson did not. He admitted that while he and Pearson shared a cell at juvenile hall they planned to rob Mrs. Oliver, and he admitted attempting to rob her on Tuesday, April 11. But he denied participating in the Holy Saturday bloodletting. He explained to the jury that he confessed to the crimes against Mrs. Oliver to protect the actual perpetrator, his half brother, Steven Bedal. At the time of his confession, he erroneously believed he could be held in custody only until he turned 18, irrespective of the nature or depravity of the offense. He claimed he stayed

4

loyal to his brother during his three and one-third years of custody, well beyond his 18th birthday and the revelation that he could spend the rest of his life in prison. Two days before he testified, however, he changed his mind. The record does not disclose why.

Although his mother had been visiting regularly throughout his incarceration and crying often, Russell told the jury that her last visit was especially emotional. For some reason, after she told him he was killing his family, he decided to recant his earlier confession and to reveal that it was actually his brother, Steven Bedal, who had robbed and murdered Mrs. Oliver with Pearson. This version goes as follows.

His brother lived down the street from Mrs. Oliver. On the evening of April 15, Bedal asked to borrow Russell's clothes and his shoes. Russell gave them to him. Bedal returned the clothes before dawn. Pearson called Russell around 7:00 o'clock the next morning, Easter Sunday, and asked Russell to meet him. According to Russell, when he arrived, Bedal and Pearson told him what had happened in graphic and mind-numbing detail. He based his false confession, he asserts, on the information his brother and Pearson had provided.

Russell denied being involved in the crimes perpetrated on Mrs. Oliver on April 15. He testified he spent the day and night with his girlfriend, although the girlfriend did not testify. He admitted he had not felt badly about any of his other victims, but he decided not to rob Mrs. Oliver because he felt sorry for her. He insisted that his brother and Pearson gave him all the details he provided his interrogator when confessing to the crimes.

Although Pearson did not testify, he relied on intoxication as a defense to first degree murder. During his confession he said he "must have blacked out or something" during the attack as he remembered holding Mrs. Oliver's hands down and the next thing he knew he was in her room. On Easter evening, the day following Oliver's murder, he ingested a triple dose of Ecstasy and blacked out. Russell testified that he saw Pearson

5

with his supplier the day of the crime, and it seemed to him that Pearson was under the influence.

The juries convicted Pearson and Russell of first degree murder, first degree residential burglary, and first degree residential robbery with special circumstances. The court sentenced them to life in prison without the possibility of parole for first degree murder with special circumstances and stayed their sentences for the two other counts. The fines and fees imposed by the court will be discussed below. Both defendants appeal.

## DISCUSSION

## I

### The Confessions

Pearson and Russell were arrested and interrogated separately. Each asserted his innocence. After skillful prodding, both eventually inculpated the other and eventually himself. Russell ultimately asserted his right to an attorney, but the interrogator failed to stop the questioning. Defendants were brought into the same interrogation room, and their incriminating conversation was recorded and played for the jury. During a joint interrogation, they confessed and incriminated each other.

Prior to trial, the parties and the court agreed that Russell lawfully invoked his right to counsel. The prosecutor agreed that the portion of the interview following Russell's invocation of his right to counsel would be excluded from the People's case-in-chief. When Russell decided to testify, however, the court ruled that his confession was voluntary and therefore admissible to impeach his testimony. The court instructed the jury accordingly.

Russell contends the confession should not have been admitted because it was involuntary. He also argues that the recording of his conversation with Pearson was inadmissible because it was an extension of his unlawful interrogation. Finally, he contends the substance of the interrogation conducted before he invoked his right to

6

counsel should have been excluded under the rationale of the *Aranda*/*Bruton* line of cases, wherein a nontestifying codefendant's extrajudicial statements are excluded.[1]  All three attempts to avoid the devastating consequences of his confession fail for the reasons we outline below.

**A.      Were Impermissible and Coercive Techniques Used to Extract an Involuntary Confession from Russell?**

*Facts Surrounding the Interrogation*

Russell, by then a veteran of the juvenile justice system, was 16 years old when he was interrogated by Detective Arnel Aquino about the death of Marie Oliver.  The detective gave Russell a *Miranda* warning[2] and attempted to establish a rapport with him.  Eventually, Aquino told Russell that Pearson had confessed and implicated Russell in the crime, and that there was physical evidence connecting him to the scene of the crime.  Russell professed his innocence.

Aquino began to turn up the heat.  He told Russell:  "You look like the worst guy out of all this thing . . . because I don't know your story.  I have -- I have [Pearson's] story.  My partner talked to him. . . .  Okay?  He told us what he did, and he told us what you did, and right now you look like the worst guy."  Russell insisted he was not involved.

Aquino tried to soften his touch.  He went on:  "[A]nother part of what I do is try to make young men, such as yourself, you're 16 years old, you got to realize that, man, it doesn't need to go down like this for me for -- for a long -- for a long time.  Because -- because I got my own side of the story.  Somebody's telling, you know, bad things about

---

[1]  *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*).

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

me, you know. The first thing admitting, okay, I was there. And I know you were there, you know you were there, right? I know it. I know how you guys found that house."

Russell sought his confidence. Aquino bluntly rejected the notion: "[T]here's nothing confidential about this, dude. You know you're a suspect in this."

Aquino encouraged Russell to provide his side of the story. Aquino warned him that he would tell the jury that Pearson cooperated, but Russell "didn't say squat." At this, Russell invoked his right to an attorney. But Aquino persisted. "So you're telling me right now -- I want to get this straight, because this is a big decision you got to make. Big decision you got to make right now. And before you make that decision, I'm going to tell you, we have physical evidence in -- putting you in the scene."

The questioning did not stop. Instead, Aquino told Russell he had physical evidence to prove Russell struck Mrs. Oliver. Holding out a photograph of the corpse, Aquino stated: "There. She's 90 years old, Danny. You know what this is? The zipper. That's a body bag. Now, I'm going to ask you right now, and you better make a decision, because you and I are done talking, and you will go -- you will face a judge and jury and your -- and God up there, without a statement, without you giving me a statement. I'm going to ask you this. You said you wanted a lawyer. Do you want a lawyer, or do you want to talk to me and explain that. Right now make that decision. This is your whole life. Tell me what you want to do. I'll respect your decision."

Russell relented. "I'll tell you what happened." Aquino made sure Russell was willing to waive his right to counsel. And then Russell gave a full confession.

The trial court examined the issue of voluntariness in light of the totality of the circumstances and ruled as follows: "With respect to the issue of the implied promise of leniency, I've carefully reviewed the portions of the transcripts that you have referenced, Ms. Harris [Russell's counsel]. And I think taken in the totality of the statements, as well as the context in which these statements were made by Detective Aquino, this court does not conclude that there were any implied promises of leniency so that Mr. Russell's

8

statements were then the product of some involuntary inducement, so I would deny your motion with respect to that.

"Again, I've carefully reviewed the transcript and I do not see where there were any implied promises that render any of your client's statements involuntary."

When Russell decided to testify, the court ruled that his statement, although given in violation of *Miranda*, was nevertheless voluntary and admissible for appropriate impeachment. The court instructed the jury that Russell's statement could be considered as impeachment.

*Analysis*

A confession is inadmissible under the federal and state Constitutions only if it is the product of police coercion. (*People v. Williams* (1997) 16 Cal.4th 635, 659.) Psychological ploys and subterfuge may or may not be coercive, depending upon the totality of the circumstances. (*People v. Mays* (2009) 174 Cal.App.4th 156, 164-165.) Police officers can use deception to trick a guilty person to confess as long as the deception is not of a kind likely to produce a false confession. (*Ibid*.) The use of deception or communication of false information to a suspect does not itself render a resulting statement involuntary. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209 (*Shawn D.*).) Rather, the dispositive question is whether the suspect's will was overborne as a result of coercive police activity. (*Id*. at p. 208.)

We are thus presented with three issues: did the police employ coercive techniques; did promises of leniency or threats become a motivating cause of Russell's confession; and did the coercion overcome his will? In reviewing the trial court's finding that Russell's confession was voluntary, we independently review all the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation. (*People v. Jablonski* (2006) 37 Cal.4th 774, 814.) " ' "[W]e accept the trial court's factual findings, based on its resolution of factual disputes, its choices among

9

conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence." [Citation.]' [Citation.]" (*Ibid*.)

Russell does not raise the formulaic complaint that he was too tired, too hungry, too naïve, too cold, too cramped, or that he suffered from any mental or emotional disabilities. He does highlight, however, that he was only 16 years old when he was interrogated and that, while he was well acquainted with juvenile adjudications, there is nothing in the record to suggest a familiarity with the adult criminal justice system. He suggests the detective's exhortations made him feel hopeless and scared and, because of his youthfulness, more willing to believe that his interrogator was his advocate. As a mere sophomore in high school, he contends he believed the detective's veiled threats that he would be forced to take the stand and account for his unwillingness to cooperate, and that his silence would be used against him. In Russell's view, the will of a 16 year old is too fragile to withstand the forceful interrogation by a detective like Aquino.

We certainly agree that Russell's age is a factor to be considered in assessing whether his confession was voluntary. But, like the trial court, we have viewed the compact disc recording of his interrogation and have read the transcript. Although Russell behaves immaturely, he does not evidence any particular susceptibility or infirmity. Indeed, for a long time he steadfastly resisted Aquino's repeated accusations that he was involved in the crimes against Mrs. Oliver and refused to give him the information he requested.

We disagree with Russell's characterization of Aquino's tactics as coercive. It is true that promises of leniency or threats of increased punishment can, under certain circumstances, be considered coercive. (*People v. Neal* (2003) 31 Cal.4th 63, 84.) However, "[m]ere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary." (*People v. Boyde* (1988) 46 Cal.3d

10

212, 238.) Russell asserts that Aquino interspersed the interrogation with sufficient promises and threats to break his malleable will. We disagree.

First, Russell's own testimony at trial belies his argument on appeal that Aquino's promises and threats motivated him to confess. Thus, to the extent that his subjective belief determines voluntariness, he loses. He testified that he confessed to Aquino he was the actual perpetrator to protect his brother out of a sense of "family loyalty" and a false belief that he could be held only until he was 18, whereas his brother, an adult, would receive a harsher sentence. He did not attribute his misconception to Aquino and indeed, to the contrary, testified as follows: "[Prosecutor:] Did the fact that you expected Detective Aquino to stop talking to you and get an attorney, did that in any way affect your ability to not tell the truth?

"[Russell:] Um, I'd have to say no.

"[Prosecutor:] So, in other words, all your lies have nothing to do with Detective Aquino, correct?

"[Russell:] That is correct."

Second, despite the false impression of coercion Russell creates by extracting snippets of the interrogation, Detective Aquino did not rely on deception and subterfuge to gain a confession. Though such techniques are persuasive (see, e.g., *People v. Cahill* (1994) 22 Cal.App.4th 296, 315; *Shawn D.*, *supra*, 20 Cal.App.4th at p. 208), Detective Aquino simply told the truth. He told Russell that Pearson had implicated him and that there was physical evidence that placed him at the scene of the crime. " 'Good faith confrontation with the confessions of other accomplices is an interrogation technique possessing no apparent constitutional vice.' [Citations.]" (*People v. Robinson* (1969) 274 Cal.App.2d 514, 520-521.)

Moreover, just because the detective pointed out to Russell the unpleasant reality that the investigation had uncovered a mountain of incriminating evidence does not mean we must subscribe to him a nefarious intention to instill a sense of hopelessness that

11

would allow him to overcome Russell's will. The truth, aptly conveyed by the detective, was that Russell had left a wealth of forensic evidence at Mrs. Oliver's house, including shoe prints and bloody gloves containing his DNA. If Russell felt hopeless, it was a hopelessness of his own doing, not Aquino's.

Yet Russell insists that Aquino delivered a one-two punch. In Russell's view, Aquino made him feel hopeless and then, pretending to be a youth advocate, assured him "it doesn't need to go down like this for me for -- for a long -- for a long time." He contends Aquino's assurances suggested that if he cooperated and admitted his involvement in the crime, he could avoid going to prison "for a long time." His promise of leniency, according to Russell, was followed by his threat that if he did not give a statement admitting his involvement, he would be put on trial and forced to take the stand and account for his failure to confess. In effect, his silence would be used against him.

Russell seems to confuse the role of a police interrogator with that of a guidance counselor, a mentor, or a spiritual director. The process is uncomfortable; indeed, a suspect when confronted with the evidence amassed against him might quite rationally assess his situation as hopeless, and when confronted with the possible consequences of his failure to cooperate might be induced to offer an explanation. An effective interrogator certainly can make the suspect squirm and sweat and worry about his fate. We detect nothing in the techniques employed by Aquino in either befriending or warning Russell that can be characterized as impermissible coercion. Any implication that Russell would receive a more lenient sentence, as the Attorney General points out, is extremely vague and should not be gleaned simply from the detective's words "for a long time."

That is, of course, not to ignore Aquino's flagrant violation of Russell's right to terminate questioning once he invoked his right to counsel, a transgression even more troubling given Russell's age. Everyone, including the prosecutor, agreed Russell's confession was inadmissible during the prosecution's case-in-chief precisely because

Aquino did not accept his young charge's request for a lawyer but pressured him to waive his right and continue the interrogation. The issue is whether Aquino's tactics, coupled with the totality of the circumstances, rendered the subsequent confession involuntary. We agree with the trial court that despite Aquino's misstep, Russell's will was not overcome and the ensuing confession was voluntary.

Failure to honor a suspect's request for an attorney does not render a confession ipso facto involuntary. (*People v. DePriest* (2007) 42 Cal.4th 1, 35-36.) Nevertheless, it is one circumstance to be considered, particularly where, as here, the suspect is young. It is true that Russell wanted the questioning to stop. But he gave no indication that Aquino's exhortations were weakening his will. He acknowledged that he knew he had the right to remain silent and that anything he said could be used against him. Given his testimony that Aquino's failure to respect his request to stop talking to him did not affect his ability to tell the truth and that his lies had nothing to do with Aquino, we conclude that he confessed freely. It was up to the jury to determine whether Russell's confession was prompted by his desire to protect his brother or because he felt guilty about the crimes he committed. Either way, we do not believe Aquino's failure to stop the interrogation or any of his exhortations, characterized as either a promise or a threat, was the proximate cause of his confession.

**B.     Did the Trial Court Err by Admitting the Recorded Conversation Between Russell and Pearson?**

Russell contends his recorded conversation with Pearson should have been excluded because it was the " 'functional equivalent' " of police interrogation that should have ceased, but did not, after he invoked his right to counsel. "If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' [Citations.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.) Here the police brought the suspects together and left them alone to talk. Russell insists that his conversation with Pearson was the " 'functional equivalent' " of a continued

13

interrogation. We disagree for the reasons illustrated in *People v. Jefferson* (2008) 158 Cal.App.4th 830 (*Jefferson*), a case with remarkably similar facts.

In *Jefferson*, two gang members were arrested for a drive-by shooting. (*Jefferson*, *supra*, 158 Cal.App.4th at pp. 833-835.) The officers lied to them about the physical evidence in an attempt to get them to confess. (*Id*. at p. 835.) When one of them refused to waive his right to remain silent and his right to counsel, the police put them in a bugged cell together, hoping they would make incriminating statements to each other. (*Id*. at pp. 835, 839.) The suspects, believing they were alone, did just as the officers hoped. (*Id*. at pp. 835-837.) On appeal, they argued it was constitutional error to admit the tape of their conversation. (*Id*. at p. 839.)

As here, the suspects argued that their conversation was the " 'functional equivalent' " of custodial interrogation. (*Jefferson*, *supra*, 158 Cal.App.4th at p. 840.) The functional equivalent of interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely [from the suspect's perspective] to elicit an incriminating response." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308].) The *Jefferson* defendants insisted the officers knew that placing them together in a cell was " 'reasonably likely to elicit an incriminating response,' " and therefore they procured their statements in violation of their Fifth Amendment and *Miranda* rights. (*Jefferson*, *supra*, 158 Cal.App.4th at p. 840.)

The court rejected their contention. "Settled law shows that Jefferson and Staten were not 'interrogated.' 'Interrogation' requires 'a measure of compulsion above and beyond that inherent in custody itself.' [Citation.] That compulsion is missing when a suspect speaks freely to someone the suspect thinks is a fellow cellmate. . . .

"Jefferson and Staten were more than just fellow cellmates. They were friends and neighbors. They spoke freely–too freely, they now realize. From their perspective, the problem was the opposite of compulsion. They were candid because they thought no

14

one else was listening, not because they were getting the third degree. It was, as the officers hoped, a spontaneous and natural conversation between friends with a dilemma on their minds. These statements were voluntary. ' "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." ' [Citation.]" (*Jefferson*, *supra*, 158 Cal.App.4th at pp. 840-841.)

The same is true here. Russell and Pearson were friends. As former cellmates, they became confidants, planning and plotting future robberies together. Once alone, they, like Jefferson and Staten, let down their guard and spoke freely. Their conversation was spontaneous; as in *Jefferson*, there was no compulsion. "[T]here was no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak." (*People v. Davis* (2005) 36 Cal.4th 510, 555.) The voluntary statements between friends were not the "functional equivalent" of an interrogation or anything close to it.

Yet Russell hints that the conversation was tainted by the detective's failure to honor his request for an attorney and should have been excluded as poisoned fruit. He forgets that "[a] subsequent confession is not the tainted product of the first merely because, 'but for' the improper police conduct, the subsequent confession would not have been obtained." (*People v. Sims* (1993) 5 Cal.4th 405, 445.) There was no connection between the police interrogation and the conversation between friends; the conversation merely followed the interrogation. Once the police detectives left the interrogation room, the element of compulsion evaporated, and the friends were free to talk to each other or not. The fact they chose to talk and to inculpate themselves and each other was a choice they made freely, and it was a choice unrelated to Russell's prior invocation of his right to counsel.

As a result, the trial court properly allowed the jury to view the taped conversation and properly instructed the jury that Russell and Pearson's conversation was not limited to use by the jury as impeachment of Russell's trial testimony. The conversation was divorced from the constitutional strictures applicable to a custodial interrogation.

15

**C.** **Did the Trial Court's Admission of Russell's Responses Following the Detective's Representation that Pearson Had Implicated Him Constitute *Aranda/Bruton* Error?**

While attempting to persuade Russell to truthfully tell him what had happened on the night Mrs. Oliver died, Detective Aquino told Russell that Pearson had already provided his side of the story. As summarized by the trial court, he reported, " '[Pearson] told us what happened. [Pearson] told us his version of what we did together. Because we already had [Pearson's] story, what [Pearson] did, we got [Pearson's] side. [Pearson] told us what he was wearing and you were wearing.' " In several different ways, Aquino conveyed the same message–that Pearson had told him what happened, including that the plan was to have somebody knock on the front door and somebody "did the back door."

Russell challenges the admissibility of his videotaped interrogation that, including references to his codefendant's story, occurred prior to his invocation of his right to an attorney. The trial court denied Russell's motion to exclude the videotape for three reasons: (1) a codefendant's extrajudicial statement was not read to the jury and, although his statements were "generically referenced," they were not specific enough to constitute an *Aranda/Bruton* violation;[3] (2) Russell's silence following his friend's accusations are admissible as adoptive admissions; and (3) Russell's statements are admissible for the nonhearsay purpose of supplying meaning to his conduct.

Before the tape was played for the jury, the court instructed the jury: "And, in addition, I do want to give you an additional instruction about this video. Law enforcement officers are permitted to pretend that they are in possession of particular facts when they may not be. Thus, the statements made by the various detectives in that regard are not themselves evidence and may only be considered as they provide context to or clarification of any statements or responses obtained."

---

[3] *Aranda*, *supra*, 63 Cal.2d 518; *Bruton*, *supra*, 391 U.S. 123 [20 L.Ed.2d 476].

16

Russell contends the preinvocation portion of his interview should have been excluded because it violated *Aranda*, *supra*, 63 Cal.2d 518 and *Bruton*, *supra*, 391 U.S. 123 [20 L.Ed.2d 476]. *Aranda/Bruton* prohibits the introduction of a nontestifying codefendant's extrajudicial statement implicating his codefendant in a joint trial, even if the jury is instructed to disregard the statement in determining the defendant's guilt or innocence. (*Bruton*, *supra*, 391 U.S. at p. 137 [20 L.Ed.2d at pp. 485-486].) Because Pearson's statement was never presented to the jury, the issue is whether Aquino's references to it are tantamount to the introduction of a codefendant's extrajudicial statement in violation of *Aranda/Bruton*.

The jury was expressly cautioned that detectives can pretend they have evidence they do not have. As a result, the jury was forewarned that the detectives' representations might not have been true, and the statements they made did not constitute evidence. Nearly all of the detective's statements to Russell were, as the trial court noted, generic references to the fact that Pearson told him his side of the story or his version of what happened. The mere fact that Pearson had provided his own account does not implicate *Aranda/Bruton*.

What is troubling is that the detective makes reference to one pertinent detail. Aquino told Russell that Pearson had described how one of them had gone to the front door and the other to the back door. This is a specific detail that comes dangerously close to the type of extrajudicial statement rendered inadmissible by *Aranda/Bruton* because his description of the manner in which the plot was executed potentially incriminates Russell.

Nevertheless, we must review the entire videotape of the interrogation up to the point that Russell invoked his right to counsel. This one small detail is swallowed up by the context in which it was provided. This is not a typical *Aranda/Bruton* situation where a codefendant's extrajudicial statement is read to the jury. Rather, an interrogator, obviously dedicated to extracting a confession from a suspect, represents that a

codefendant has already given his side of the story. The jury may or may not believe that Pearson actually said the things that Aquino represented he said. All but the one detail about the defendants' positioning was, as the trial court found, a rather general reference to a codefendant's statement. Thus, we must agree with the trial court that Aquino's paraphrasing of what Pearson may or may not have said does not constitute the type of extrajudicial statement *Aranda*/*Bruton* was designed to exclude. The court did not err by admitting that portion of the videotape recording of the interview prior to the time Russell invoked his right to counsel.

## II

### Sufficiency of the Evidence to Support the Special Circumstance

The jury found Russell guilty of felony murder, a special circumstance authorizing a life sentence without the possibility of parole. He contends his life sentence must be reversed because there is no substantial evidence that he was either the actual killer or that he was a major participant who knew his participation involved a grave risk of death. In a variation on the theme that boys will be boys, he suggests that, at 16, he did not realize that burglarizing and robbing Mrs. Oliver involved a risk of death. In fact, he uses her disabilities to mitigate his culpability, arguing that because he knew she was partially blind and deaf, he believed the theft could be accomplished by stealth. Appellate review of a challenge to the sufficiency of the evidence to support a special circumstance finding is as limited as any garden variety insufficiency claim. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229.)

Under the due process clauses of the federal and state Constitutions, the test as to whether there is sufficient evidence to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime [or special circumstance] beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; see *People v. Holt* (1997) 15 Cal.4th 619, 667.) From a review of the whole record, we

18

must ascertain whether it discloses substantial evidence, " 'that is, evidence which is reasonable, credible, and of solid value' " that the trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.) Circumstantial evidence may be substantial. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) A trier of fact is at liberty to draw reasonable inferences, and those inferences may constitute substantial evidence. (*People v. Creath* (1995) 31 Cal.App.4th 312, 319.)

In order to find the special circumstances true, the jury had to find either that Russell was the actual killer (Pen. Code, § 190.2, subd. (b))[4] or that he was a major participant in the robbery and burglary and acted with reckless indifference to human life (§ 190.2, subd. (d)). The actual killer is necessarily a major participant and thus evidence supporting a jury's finding that Russell was the actual killer would also support a finding that he was a major participant with the requisite knowledge of the risk of death. Consequently, we need not determine if he was the actual killer. We need only evaluate the sufficiency of the evidence to support a finding that he was a major participant.

Section 190.2, subdivision (d) provides, in relevant part: "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony . . . which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance . . . has been found to be true . . . ."

Russell does not challenge the sufficiency of the evidence to support a jury finding that he was a "major participant" within the meaning of section 190.2, subdivision (d). But he does challenge the sufficiency of the evidence that he possessed the requisite

---

[4] Further statutory references are to the Penal Code unless otherwise designated.

mental state. " '[R]eckless indifference to human life' " means "that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) An act poses a "grave" risk of death if there is "a high degree of probability that it will result in death." (*Id*. at p. 578.)

Since Russell admitted he chose Mrs. Oliver as the target for their burglary/robbery plot because he knew her and knew of her physical limitations, he launched an unsuccessful attempt to break into her house four days before the fatal attack, and he admitted his involvement in the commission of the felonies to Pearson in a recorded conversation, discussed how he spent the proceeds of the burglary, and remarked that they "should have been smarter about it," he is wise not to contest the incontrovertible fact that he was a major participant. He insists, however, there is no substantive evidence that he was aware that his participation posed a high degree of probability that it would result in death.

The linchpin of Russell's argument is that his confession could be used only for impeachment purposes. The jury, he emphasizes, was instructed that his statement could not be considered "as proof that the statement is true or for any other purpose." But he ignores the mountain of forensic evidence he left at the scene, the reasonable inferences the jury could make from the circumstantial evidence, and the powerful impact of the admissions he made to Pearson in the videotaped recording that was ultimately played for the jury.

Russell's DNA was found on the inside of the bloody gloves recovered in Mrs. Oliver's house. Her blood was on his black sweatshirt and on his shoe. And his shoe prints were found both inside and outside the house. He maintains that even if the jury rejected his testimony that his brother had borrowed his clothes and shoes and that he had tried on the gloves on Tuesday, not Saturday, the physical evidence does not prove that he realized violence would erupt before he entered the house. He points to a legion of cases in which the aider and abettor found guilty of the felony murder special

20

circumstance realized the perpetrator was carrying a deadly weapon well in advance of undertaking the commission of the felony. (See, e.g., *People v. Proby* (1998) 60 Cal.App.4th 922; *People v. Mora* (1995) 39 Cal.App.4th 607; *People v. Bustos* (1994) 23 Cal.App.4th 1747.)

Russell posits an artificial time constraint. Based on the random selection of cases he cites, he assumes that the aider and abettor must realize the grave risk of death before he becomes involved. Not so. As a 16 year old, he may or may not have realized that a home invasion burglary is fraught with the risk of death. We may even assume, as he urges us, that because neither he nor Pearson was armed and he knew how feeble his 90-year-old benefactor was, he did not foresee that anyone would be hurt, let alone killed.

But we cannot ignore the substantial evidence of what happened after Russell and Pearson entered the house. It is true that we do not know precisely when each of them entered. Russell insists that he may have aided and abetted Pearson only after the fatal beating, and that was certainly an inference the jury was free to accept. But it was the jury's prerogative to reject the inferences Russell urges on us on appeal, based at least in part on the admissions he made to Pearson during their recorded conversation.

Russell reported to Pearson that he had bought something for his girlfriend with the money they had taken. He stated that he still had about "[s]ixty-something" left. Optimistically, be predicted, "Nigger, we doing at least a year, you know, knock on wood that we don't." And he lamented, "Fuck, I knew I should have changed my shoes, too." And later, expressing his concern about the shoe prints the detectives had recovered, he admitted: "We should have been smarter about it. I, man, I knew I should have bought new shoes, too."

Pearson told Russell that he told the detective, " 'We both did it.' " The transcript reports that Russell responded, "Uh-huh." We need not settle the rancorous debate between Russell and the Attorney General as to whether Russell's response constitutes an adoptive admission. The adoptive admission exception to the hearsay rule may require

21

technical prerequisites for admissibility, but we are not concerned with admissibility. Rather, the interchange between Pearson and Russell is but another piece of the circumstantial evidence the jury could consider in determining Russell's level of complicity and whether he had the requisite mental state to sustain the special circumstance.

Russell's testimony that it was his brother who, wearing his clothes, committed the crimes was completely impeached by his own confession. Having rejected that defense, the jury could consider the physical evidence putting him inside the house; Russell's prior conduct in attempting a burglary and robbery four days before the murder; his admissions that he spent the money and that they should have been smarter, should have bought new shoes, and might have to serve up to a year in prison; and his failure to object to Pearson's statement that they both did it. The dispositive question is whether the jury could draw a reasonable inference from the circumstantial evidence that Russell was subjectively aware of the grave risk of death to Mrs. Oliver as he ransacked her house and aided and abetted Pearson.

We believe there is. *People v. Smith* (2005) 135 Cal.App.4th 914 (*Smith*) provides an apt analogy. In *Smith*, two men robbed their victim in a motel room while the third merely acted as a lookout. The Court of Appeal upheld the special circumstance based on evidence the lookout failed to help the victim or summon help. The court wrote: "Even if Taffolla remained outside Star's room as a lookout, the jury could have found Taffolla gained a 'subjective awareness of a grave risk to human life' during the many tumultuous minutes it would have taken for Star to be stabbed and slashed 27 times, beaten repeatedly in the face with a steam iron, and had her head slammed *through* the wall. In addition, when [her attacker and Taffolla's confederate] emerged from her room covered in enough blood to leave a trail from the motel to McFadden Street, Taffolla chose to flee rather than going to Star's aid or summoning help." (*Id*. at p. 927.)

Mrs. Oliver's blood was on Russell's sweatshirt and shoes, and his DNA was found inside the gloves covered in her blood. Thus, the jury could reasonably infer that Russell was inside the house during the savage attack. As in *Smith*, the jury could have found that Russell gained a subjective awareness of the grave risk of death as he either helped or observed the beating. The pathologist gave a grave accounting of the number of injuries Mrs. Oliver suffered to her face, head, arms, buttocks, and ribs, thereby suggesting, as in *Smith*, that Russell would have been aware of the brutal beating and appreciated the risk of death while aiding and abetting the robbery. Moreover, he, like the lookout in *Smith*, did nothing to render aid to Mrs. Oliver, a further reflection of the reckless indifference he had toward whether she lived or died.

In short, we conclude there was sufficient circumstantial evidence to support the jury's implied finding that Russell was a major participant in the commission of the burglary and robbery and harbored a reckless indifference toward human life. Viewing the entire record, as we must, in favor of the prosecution, we believe the jury could reasonably infer that during the commission of the felonies, if not before, Russell was subjectively aware that his old, frail, and disabled friend was at risk of death. And yet he acted in reckless disregard of her fate. Given the limited scope of appellate review, we must sustain the jury's special circumstance finding.

## III

### Instructional Error

#### A.    CALCRIM No. 372:  Flight

Pearson and Russell contend that CALCRIM No. 372 is unconstitutional because it eliminates the presumption of innocence and lowers the prosecution's burden of proof. Pearson also alleges it is unconstitutional because the language of the standardized jury instruction differs from the statute upon which the instruction is based, section 1127c. We squarely addressed and soundly rejected these identical arguments in *People v.*

23

*Paysinger* (2009) 174 Cal.App.4th 26, 30-32. For all the reasons explained in *Paysinger*, we again reject defendants' constitutional challenge to CALCRIM No. 372.

A more difficult issue is whether there is substantial evidence to support giving the instruction. As Pearson points out, where evidence of flight is lacking, it is error to instruct the jury on the subject. (*People v. Watson* (1977) 75 Cal.App.3d 384, 403; *People v. Clem* (1980) 104 Cal.App.3d 337, 344.) Moreover, we must not "confuse a mere departure from the scene of the crime with a deliberate flight from the area in which the suspect is normally to be found." (*People v. Green* (1980) 27 Cal.3d 1, 37, disapproved on another ground in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.) Defendants argue there is no evidence they fled the scene.

That is not true. The evidence may be thin, but some evidence exists. But is the evidence sufficient to justify a flight instruction?

"To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) Russell testified, albeit under the premise that Bedal and Pearson told him what had happened, that after they hit Mrs. Oliver they went through her house. While they were in one of the rooms, something fell and made a loud crash. Believing one of the neighbors might have heard the noise, they immediately departed Mrs. Oliver's house.

Russell's testimony constitutes sufficient evidence to justify the flight instruction. The jury could draw the reasonable inference that the loud crash caused the assailants to flee to evade notice and capture. The instruction provides the jury the opportunity to decide whether the assailants fled or not and, if so, whether their flight demonstrates a consciousness of guilt. The court did not err by giving the instruction.

24

**B.     CALCRIM No. 376:  Receiving Stolen Property**

The trial court instructed the jury in the language of CALCRIM No. 376 as follows:

"If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of crimes charged in Counts 1, 2, and 3 based on those facts alone.  However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed crimes charged in Counts 1, 2, and 3.

"The supporting evidence need only be slight and need not be enough by itself to prove guilt.  You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of crimes charged in Counts 1, 2, and 3.

"Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

CALCRIM No. 376, like its predecessor CALJIC No. 2.15, is generally favorable to defendants and is designed to admonish the jury that receipt of stolen property alone is not sufficient to convict a defendant of other theft crimes.  (*People v. Yeoman* (2003) 31 Cal.4th 93, 131 (*Yeoman*).)  Yet Russell and Pearson argue the instruction allows the jury to draw inferences that are not rationally connected to the possession of stolen property and it lessens the prosecution's burden of proof.  The Attorney General concedes the instruction was improper insofar as the trial court applied it to murder.

Defendants add nothing new to the hackneyed arguments raised before and rejected by the Supreme Court.  The law is settled.  "In the presence of at least some corroborating evidence, [the instruction] permits–but does not require–jurors to infer from possession of stolen property guilt of a related offense such as robbery or burglary. We have held the instruction satisfies the due process requirement for permissive

25

inferences, at least for theft-related offenses: the conclusion it suggests is ' "one that reason and common sense justify in light of the proven facts before the jury." ' [Citations.] Accordingly, we have repeatedly upheld the giving of the instruction in such cases . . . ." (*People v. Gamache* (2010) 48 Cal.4th 347, 375 (*Gamache*).) The Supreme Court, as the Attorney General recognizes, does not condone the use of the instruction to prove murder.

Moreover, the court has consistently rejected defendants' contention that the instruction lowers the prosecution's burden of proof. (*People v. Parson* (2008) 44 Cal.4th 332, 356; *People v. Prieto* (2003) 30 Cal.4th 226, 248; *Yeoman*, *supra*, 31 Cal.4th at p. 131.) "The instruction does not establish an unconstitutional mandatory presumption in favor of guilt [citation] or otherwise shift or lower the prosecution's burden of establishing guilt beyond a reasonable doubt [citations]." (*Gamache*, *supra*, 48 Cal.4th at p. 376.)

It is equally well established that the error in applying CALCRIM No. 376 to murder is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Gamache*, *supra*, 48 Cal.4th at p. 376.) We must determine whether it is reasonably more probable defendants would have obtained a more favorable result had the instruction not been extended to the murder charge. Under the *Watson* standard, the error was clearly harmless.

Russell's admission he spent some of the money taken from Mrs. Oliver and retained about "[s]ixty-something" dollars paled in significance to the abundant evidence the prosecutor presented at trial. The DNA evidence and the shoe prints connected Russell to the scene of the crime. His improbable defense was impeached by his confession. His friend admitted they both had beaten Mrs. Oliver, and Russell raised no objection to the admission. Russell himself admitted he attempted to rob and burgle Mrs. Oliver four days before the murder, and it was Russell who knew her, knew how

26

vulnerable she was, and identified her as the target. Whether he was in possession of a few dollars taken from Mrs. Oliver was almost inconsequential.

Pearson, unlike Russell, did not dispute that he participated in the burglary, robbery, and murder of Mrs. Oliver. Indeed, he confessed to the crimes. He attempted to convince the jury he was guilty only of second degree murder because he was under the influence of Ecstasy. The question as to whether or not he possessed stolen property paled in significance to the undisputed facts.

We conclude the extension of CALCRIM No. 376's allowing the jury to erroneously infer murder from the mere receipt of stolen property was harmless because defendants would not have received a more favorable result if the instruction had not been extended to murder.

## C. Failure to Instruct that Russell Was an Accomplice as a Matter of Law

Pearson complains that the court erred by not instructing his jury that Russell was an accomplice as a matter of law. The court instructed the jurors to determine whether Russell was an accomplice before considering his testimony. (CALCRIM No. 334.) Pearson contends that since he and Russell were charged with identical crimes and liable for identical crimes, Russell was an accomplice as a matter of law. Because in Pearson's view Russell was an accomplice as a matter of law, the jury was obligated to view his testimony with caution and could not find Pearson guilty in the absence of supporting evidence independent of Russell's testimony connecting him to the crime. Since the jurors were not instructed Russell was an accomplice as a matter of law, they were at liberty to view the testimony without caution and to convict in the absence of corroboration. He urges us to reverse the judgment on the basis of instructional error.

We conclude the court properly instructed the jury. "When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice. If the evidence establishes as a

27

matter of law that the witness was an accomplice, the court must so instruct the jury, but whether a witness is an accomplice is a question of fact for the jury in all cases unless 'there is no dispute as to either the facts or the inferences to be drawn therefrom.' (*People* v. *Garrison* (1989) 47 Cal.3d 746, 772 . . . .)"  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1270-1271.)

In *People v. Hill* (1967) 66 Cal.2d 536 (*Hill*), all of the evidence placed the confessing codefendant in the company of his two codefendants during the commission of the crimes for which they were all charged.  The court acknowledged that it appeared they were accomplices as a matter of law.  Nevertheless, "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants.  (*People* v. *Richardson* (1960) 182 Cal.App.2d 620, 623 . . . .)  It is not error even to forego the giving of accomplice instructions where the giving of them would unfairly prejudice a codefendant in the eyes of the jury."  (*Hill*, at p. 555.)

Here there was a dispute as to the facts and the inferences to be drawn from them.  Russell recanted his confession at trial and thereafter ascribed all responsibility for the crimes to Pearson and his brother.  His testimony, if believed, meant he was not an accomplice to the burglary, robbery, and murder of Mrs. Oliver.  As a result, the evidence was disputed and the issue whether Russell and Pearson were accomplices was a factual dispute for the jury to resolve.

Both Pearson and the Attorney General highlight the improbability that any juror would believe Russell's testimony.  Moreover, Pearson argues that because Russell did not make a judicial confession and he would not have been prejudiced by an instruction that rendered Russell his accomplice as a matter of law, *Hill* does not apply and the court should have instructed the jury in the alternative language of CALCRIM No. 335.  He

argues, in effect, that we evaluate the strength of his defense and prejudge what the jury would or should decide.

The fact that Russell attempted to retract his confession and did not make a "judicial confession" in the same manner his counterpart did in *Hill* is a distinction without a difference. Russell's confession during his interrogation as well as his testimony inculpated Pearson. The determinative factor, as reported in *Hill*, is whether there is any factual dispute whether the codefendants are accomplices. Here, according to Russell at trial, he did not accompany Pearson to Mrs. Oliver's on the night of the commission of the charged crimes and did not participate in those crimes in any way. His testimony, believable or not, created a factual dispute and justified the court's instruction allowing the jury to determine whether Russell was an accomplice before determining how to evaluate his testimony. There was no error.

## IV

## Prosecutorial Misconduct

### A. *Doyle* Error

Russell accuses the prosecutor of misconduct by commenting on his post-*Miranda* silence. "Both federal and state courts have held that the prosecution's use of a defendant's post-*Miranda* silence is a violation of federal due process. (*Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 . . . ]; *Wainwright v. Greenfield* (1986) 474 U.S. 284, 295 [88 L.Ed.2d 623 . . . ] [(*Doyle*)]; *People v. Crandell* (1988) 46 Cal.3d 833, 878 . . . .) . . .

"To establish a violation of due process under *Doyle*, the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument. . . .

"An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument. (*Greer v. Miller*[ (1987)] 483 U.S. [756,] 765-766 [97 L.Ed.2d 618].) A

29

violation of due process does not occur where the prosecutor's reference to defendant's postarrest silence constitutes a fair response to defendant's claim or a fair comment on the evidence." (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1447-1448.)

We examine the context of the prosecutor's inquiry. Russell's lawyer asked him a series of questions about his motivation for confessing to the crimes. He explained that he wanted to protect his brother, the actual perpetrator, because he believed that as a juvenile he would only have to serve a couple of years in prison, whereas his brother, an adult, would be subject to a much longer term. Thus, he confessed out of "family loyalty." And he did not disclose his brother's name even when he was alone with Pearson because he knew they were being recorded.

The prosecutor cross-examined Russell about his motivation, attempting to impeach his testimony that he continued to keep silent about his brother's commission of the crimes due to his erroneous belief that his brother would suffer a much greater punishment than he and due to his undying loyalty to his brother. The prosecutor inquired when Russell was advised of the charges against him, including the pertinent facts that he would be tried as an adult and was facing life in prison. Russell admitted that he learned of his potential sentence within a week of his arraignment. The prosecutor also probed as to why Russell would provide abundant details into the crime if his sole motivation was to protect his brother. In closing argument, the prosecutor mocked Russell's professed loyalty, his abrupt about-face during trial, and his ability to recall details with such specificity based on his brother's report of what had happened at Mrs. Oliver's.

Russell complains that the prosecutor improperly exploited his belated defense of third-party culpability. The prosecutor challenged Russell about his failure to come forward to law enforcement before trial or, alternatively, to tell friends and family that his brother, not he, was responsible for the crimes against Mrs. Oliver. Russell now asserts

30

that the prosecutor's questions and argument took unfair advantage of his right to remain silent and therefore constitute *Doyle* error. We disagree.

The prosecutor did not make reference to Russell's exercise of his constitutional right to remain silent. Rather, the prosecutor sought to rebut the notion that Russell had spent the previous three years four months in jail on his brother's behalf, as he professed, when in fact he had known he would be charged as an adult and faced life in prison within a week of his arraignment. Cross-examination afforded the prosecutor the opportunity to get a fair response to Russell's dubious claim that he did not identify his brother as the perpetrator because he faced a much lighter sentence. A fair reading of the record, including the prosecutor's cross-examination and closing argument, discloses there was no exploitation of Russell's right to remain silent but an utterly proper exploration of why Russell first confessed and later recanted the confession, only to blame the very brother he supposedly had confessed to protect.

**B.      Questions and Arguments about Juvenile Offenses**

Russell also complains about a second variant of prosecutorial misconduct that violated both the spirit and the letter of an in limine ruling sanitizing his prior offenses. He argues that the prosecutor improperly asked him questions and argued to the jury, in essence, that because of his juvenile offenses he had a propensity to commit the charged crimes. He characterizes the prosecutor's transgressions as the type of egregious misconduct that so infects the trial with unfairness as to render the conviction a denial of due process. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) We find no egregious pattern of misconduct, no unfairness, and no violation of Russell's right to due process.

The trial court granted the defense motion to refer to his robbery conviction as a "felony theft offense" and prohibited the use of his juvenile convictions to show propensity. During cross-examination, the prosecutor sought to impeach Russell's testimony that he did not participate in the charged crimes because he came to the realization during the attempt to burglarize and rob Mrs. Oliver four days earlier that he

31

felt sorry for her. The prosecutor asked Russell if he felt sorry for each of his earlier victims. When the prosecutor referred to the "felony theft offense," Russell was flummoxed. He asked for clarification. The prosecutor tried to clarify without referring expressly to the robbery. A sidebar discussion ensued.

During this discussion, the trial court agreed to allow the prosecutor to question him regarding the robbery. "And the Court did overrule that objection because it was very clear that in order for Mr. Russell to have an understanding as to what the question was, it did require greater specificity, and I did allow [the prosecutor] to do so." Once Russell's recollection was refreshed about the robbery, he testified that he did not feel sorry for robbing the victim. Nor did he feel sorry for any of his other victims.

As a consequence, we disagree that the prosecutor committed misconduct by violating the in limine order. The court gave him permission to refer to the robbery because Russell could not answer the question if the characterization of the prior offense remained sanitized. Nor did the prosecutor violate the proscription against using the prior offenses to show propensity. Quite clearly, the prosecutor asked Russell if he felt the same empathy for his other victims as he purportedly felt for Mrs. Oliver to impeach Russell's improbable testimony that he had suddenly abandoned his plan to participate in a burglary/robbery at her house because of his newfound sense of empathy. The jury could then assess whether they believed his abrupt transformation given his candid testimony that he did not feel sorry for any of his prior victims. The questioning was proper to impeach Russell and was not used merely to show his propensity to commit theft offenses.

We further reject Russell's accusations that the prosecutor committed misconduct by asking him if he was a criminal and by arguing that he had been a criminal all his life, albeit an arrogant juvenile criminal. He argues that the prosecutor's inquiry and argument were all designed to have the jurors infer from Russell's juvenile record that he is a criminal with a criminal disposition who must be guilty of the current offense

32

because he is a criminal. After all, the prosecutor concluded, "It's what he is and what he does."

Taking snippets here and there, Russell ignores the context in which the prosecutor asked questions and framed his argument. And read in context, the prosecutor's inquiry and argument is legitimate impeachment rather than prohibited propensity evidence. For example, Russell testified that he generally lied to the police. When asked why he lied, he responded that he did not trust them based on his past experiences. Probing further into his justification for lying, the prosecutor asked the direct question, "You're a criminal, right?" Russell agreed with the statement and the prosecutor wrapped up his impeachment by exposing Russell's propensity to lie with the question, "And so did it surprise you how officers treat you because you're a criminal?"

The prosecutor returned to the same theme during closing argument. And again the references to his criminality were in the context of impeaching his credibility. As another example, the prosecutor argued: "He wants you to believe that, oh, yeah, you know, all of a sudden I just felt sorry for her. Come on now. Did he feel sorry for any of the other victims that he committed crimes against? No. Defendant simply is what he is: A liar, a thief, and a murderer. Now, all he did was take his criminal activity to the next level. It's what he is and what he does. And he planned these crimes in Juvenile Hall. Went back on Tuesday to burglarize and rob Mrs. Oliver. Couldn't get in. They simply came back on Saturday to finish the job. It's really not a difficult case at all. [¶] . . . [¶]

"He did all this for one simple fact. One, he's a liar and, two, to make himself look good, put himself in a better light. He throws Pearson underneath the bus. In court what does he do? He throws Bedal underneath the bus. It's what he is. It's what he is. He doesn't really tell the truth until you actually put the Defendants together. Then he tells the truth. One simple reason he made up the story. Last chance. Last efforts to prevent himself from going to prison. That's all. Do not be fooled."

Viewed in this context, the focus of the prosecutor's argument was challenging Russell's credibility.  He urged the jury not to believe him because he was a liar.  Thus, it is not likely the jury understood or applied the isolated comments Russell extracts from the argument in an improper or erroneous manner.  We find no prosecutorial misconduct.

## V

## Sentencing

### A.    Life Without Parole Presumption

Section 190.5, subdivision (b) provides:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

In *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn*), the court concluded that life without the possibility of parole (hereafter life without parole) is the presumptive sentence required by section 190.5.  The court explained:  "We believe Penal Code section 190.5 means, contrary to the apparent presumption of defendant's argument, that 16- or 17-year-olds who commit special circumstance murder *must* be sentenced to [life without parole], *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life.  Our construction is based on the ordinary language and structure of the provision; in context, the word 'shall' appears to be mandatory.  In addition, this construction is consistent with the history of Penal Code section 190.5, enacted as part of Proposition 115, the 'Crime Victims Justice Reform Act.'  Under the former law, youthful offenders were exempted from application of the death penalty provisions.  They also were excluded from application of the special-circumstance proceedings under Penal Code section 190.4, so that murderers under age 18 tried as adults were subject neither to the death penalty nor to [life without parole].  (See

34

*People* v. *Marquez* (1992) 1 Cal.4th 553, 582 . . . .)  Penal Code section 190.5 was amended specifically to make youthful offenders, who committed what would have been a death-eligible crime for an adult, subject to special circumstances and [life without parole].  The fact that a court might grant leniency in some cases, in recognition that some youthful special circumstance murderers might warrant more lenient treatment, does not detract from the generally mandatory imposition of [life without parole] as the punishment for a youthful special circumstance murderer.  In the first instance, therefore, [life without parole] is the presumptive punishment for 16- or 17-year-old special-circumstance murderers, and the court's discretion is concomitantly circumscribed to that extent." (*Guinn*, *supra*, 28 Cal.App.4th at pp. 1141-1142.)

The trial court stated it was "aware of its statutory authority under Penal Code Section 190.5(b) to reduce the presumptive punishment in this case from life without the possibility of parole to a sentence of 25 years to life."  Russell and Pearson contend that section 190.5 creates an unconstitutional presumption at odds with " ' "the evolving standards of decency that mark the progress of a maturing society[]" ' *Estelle v. Gamble, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* (quoting *Trop v. Dulles, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)* (plurality opinion))" as embraced by the United States Supreme Court and California Supreme Court in a trifecta of cases decided after the trial court sentenced defendants to life without parole.  (*Graham v. Florida* (2010) 560 U.S. 48, 58 [176 L.Ed.2d 825, 835] (*Graham*); see *Miller*, *supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 417]; *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).)

Recently, in *People v. Gutierrez* (2014) 58 Cal.4th 1354, our Supreme Court questioned *Guinn*'s holding, ruling that section 190.5 is ambiguous–it is reasonably susceptible of two constructions–and nothing in the statute's legislative history supports the conclusion that it was intended to create a presumption in favor of life without parole.  After examining the United States Supreme Court holdings in *Roper v. Simmons* (2005)

35

543 U.S. 551, 560 [161 L.Ed.2d 1] (*Roper*), *Graham*, and *Miller*, and the application of those principles in *Caballero*, *supra*, 55 Cal.4th 262, the court opined that "[r]eading section 190.5(b) to establish a presumption in favor of life without parole–i.e., a rule that '16- or 17-year-olds who commit special circumstance murder *must* be sentenced to [life without parole], *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life' (*Guinn*, *supra*, 28 Cal.App.4th at p. 1141, original italics)–is in serious tension with . . . *Miller*." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1379.) The court rejected the Attorney General's efforts to harmonize *Guinn*'s holding with *Miller*'s principles and applied the well-established rule of statutory interpretation that, "[b]ecause section 190.5(b) is reasonably susceptible to two interpretations, we will adopt the construction that renders it ' "free from doubt as to its constitutionality." ' [Citation.]" (*Gutierrez*, at p. 1387.) *Gutierrez* therefore requires us to read section 190.5 as giving the trial court discretion, unfettered by any presumption, in deciding whether to impose a life without parole sentence.

Obedient to *Guinn* but contrary to the subsequent holding in *Gutierrez*, the trial court believed there was a presumptive sentence in favor of life without parole, a belief it documented on the record. The question is whether the court's erroneous belief compels reversal and remand for sentencing in accordance with the principles of *Miller* as explained in *Gutierrez*. The Attorney General argues that remand for resentencing is unnecessary for two reasons: (1) *Miller* does not apply because recent amendments to California's sentencing law will provide defendants the opportunity to petition for parole 15 years into the future, and (2) the trial court realized it had the discretion to sentence defendants to 25 years to life and considered the very factors the Supreme Court enumerated in *Graham* and *Miller*.

Subject to exceptions not relevant here, section 1170, subdivision (d)(2) retroactively permits a defendant who was sentenced to life without parole for a crime committed as a juvenile to petition the court for recall and resentencing after serving at

least 15 years of that sentence. The Attorney General argues that because the Legislature has provided a statutory procedure whereby such a defendant can petition for resentencing sometime in the future it is no longer a true life without parole sentence, and thus *Miller* does not apply. A similar argument was made and rejected in *Gutierrez.* We reject the Attorney General's argument here as well.

In *Gutierrez*, the Attorney General argued the enactment of section 1170, subdivision (d)(2) eliminated any constitutional problems arising from the *Guinn* presumption by effectively transforming the sentence into life with the possibility of parole. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1384-1386.) The Supreme Court disagreed, pointing out that even if the defendant were successful in his petition, the same questionable presumption would apply at resentencing because the new sentencing hearing must be conducted " 'in the same manner as if the defendant had not previously been sentenced.' " (*Id*. at p. 1385; see § 1170, subd. (d)(2)(G).) More to the point here, the court further observed: "Nor does the fact that section 1170[, subdivision] (d)(2) provides a potential mechanism for resentencing after 15 to 24 years mean that the initial sentence 'is thus no longer effectively a sentence of life without the possibility of parole,' as the Attorney General's briefing contends. A sentence of life without parole under section 190.5[, subdivision] (b) remains *fully effective* after the enactment of section 1170[, subdivision] (d)(2)." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386.)

Even while acknowledging that section 1170, subdivision (d)(2) leaves the life without parole sentence intact, the Attorney General insists that, by providing a meaningful opportunity for juvenile offenders to obtain release based on demonstrated maturity and rehabilitation, the statute nonetheless addresses the constitutional concerns expressed in *Graham* and *Miller*. The court explained: "Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.'

[Citation.]" (*Gutierrez, supra*, 58 Cal.4th at p. 1386.)  In brief, the right to request reconsideration of a life without parole sentence, based upon facts that develop after sentencing, is not a substitute for individualized consideration of the juvenile sentencing factors outlined in *Miller* before imposing the sentence on a juvenile homicide defendant.

The record supports the Attorney General's argument that the trial court carefully considered both aggravating and mitigating circumstances as they related to the exercise of its discretion to impose a 25-years-to-life sentence.  As we describe below in rejecting defendants' claim that life without parole is cruel and unusual punishment, Mrs. Oliver was beaten to death under appalling circumstances.  Nevertheless, the court did not, as the Supreme Court mandated in *Miller*, "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, ___ U.S. at p. ___ [183 L.Ed.2d at p. 424].)  Nor do we know to what extent the presumptive life without parole option influenced the court's evaluation of defendants' culpability.  Under the circumstances, we follow the dictates of *Gutierrez*.

"Absent evidence to the contrary, we presume that the trial court knew and applied the governing law.  (See *People v. Thomas* (2011) 52 Cal.4th 336, 361 . . . .)  To be clear, we do not fault the trial courts in these cases; they dutifully applied the law as it stood at the time.  But we conclude that neither court made its sentencing decision with awareness of the full scope of discretion conferred by section 190.5(b) or with the guidance set forth in *Miller* and this opinion for the proper exercise of its discretion.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.  (See *United States v. Tucker* (1972) 404 U.S. 443, 447 [30 L.Ed.2d 592, 596, 92 S.Ct. 589]; *Townsend v. Burke* (1948) 334 U.S. 736, 741 [92 L.Ed. 1690, 1693, 68 S.Ct. 1252].)  A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' (*People v. Belmontes* (1983) 34 Cal.3d 335,

348, fn. 8 . . . .) In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' (*Ibid.*; see *People v. Rodriguez* (1998) 17 Cal.4th 253, 257 . . . ; *Romero*, *supra*, 13 Cal.4th at p. 530, fn. 13.) Although the trial courts in these cases understood that they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of life without parole, we cannot say with confidence what sentence they would have imposed absent the presumption. Accordingly, we remand both cases for resentencing." (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1390-1391.)

Here also, we do not fault the trial court for following established precedent. However, the precedent has changed and we are compelled to remand this matter for resentencing in accordance with the guiding principles set forth in *Gutierrez*.[5]

## B.    Cruel and Unusual Punishment

Pearson and Russell, who were both 16 years old when Mrs. Oliver was murdered, urge us to extend the logic of recent Supreme Court opinions declaring statutes unconstitutional that authorize the death penalty for juveniles and life without parole for juveniles who do not commit homicide to cases, like theirs, where juveniles are convicted of murder but they may not have committed murder. (*Roper*, *supra*, 543 U.S. at p. 568 [161 L.Ed.2d at p. 21]; *Graham*, *supra*, 560 U.S. 48 [176 L.Ed.2d 825].) They insist their life without parole sentences constitute cruel and unusual punishment under the federal and state Constitutions because there is no substantive evidence that either of them was

---

[5]  At our request, the parties provided supplemental briefing on section 1170, subdivision (d)(2) and its effect on the issues herein. However, none of the parties requested leave to provide additional briefing on *Gutierrez*, *supra*, 58 Cal.4th 1354.

39

the actual perpetrator or that either of them intended to kill. In light of the Supreme Court's opinion in *Miller* whereby it declined to impose a categorical ban on life without parole sentences for juveniles who commit homicide, we reject defendants' invitation to write new law. Nor do we accept their argument that in their cases, a life without the possibility of parole sentence is cruel and unusual.

"[T]he Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution preclude punishment that is disproportionate to a defendant's individual culpability." (*People v. Webb* (1993) 6 Cal.4th 494, 536.) "To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Lucero* (2000) 23 Cal.4th 692, 739-740.)

On appeal, both defendants assume erroneously that they were convicted only of felony murder. Both argue there is no evidence they intended to kill Mrs. Oliver. They point to the fact they were unarmed when they entered her house. And, they insist, there is no direct evidence who was the perpetrator. Thus, they contend they are more deserving of a lighter sentence than someone like the 17-year-old shooter in *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*),[6] who actually shot and killed the victim. They

_____

[6] Aspects of *Dillon* were abrogated by statute as explained in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186.

ignore the mountain of direct and circumstantial evidence that they were both complicit in the horrendous and senseless beating of Mrs. Oliver. The circumstances surrounding the tragic demise of Mrs. Oliver, including the extent of defendants' involvement, the manner in which they beat a debilitated 90-year-old woman to death, and their sad and sordid backgrounds put their level of culpability on an entirely different level than Dillon's.

Dillon accompanied a group of friends to a field to steal some marijuana. One of his friends accidentally fired a shot, thereby alerting the owner to their presence. Believing that the owner had shot his friend and was going to shoot him, Dillon fired at him. Dillon had no prior record. (*Dillon*, *supra*, 34 Cal.3d at pp. 451-452, 482, 486.) The court reduced his murder conviction to second degree murder. (*Id*. at p. 489.)

Other than age, defendants have little, if anything, in common with Dillon, and the circumstances of the shooting bear no resemblance to the beating of Mrs. Oliver. By Pearson's and Russell's 16th birthdays, both had extensive juvenile records. Both had served time in juvenile hall; in fact, juvenile hall is where their friendship blossomed.

Whereas Dillon and his friends set out to steal marijuana from a field, Pearson and Russell, while they were still in juvenile hall together, planned to rob a very elderly lady they knew was partially blind and deaf. Dillon might have been surprised to encounter anyone as he and his friends attempted to grab some marijuana, but Pearson and Russell specifically targeted Mrs. Oliver because they knew she was defenseless. In fact, when their first attempt proved unsuccessful, they tried again a mere four days later. They knew she was in the house at the time they broke in. Whereas Dillon reacted spontaneously, believing his own life was in danger, Pearson and Russell plotted and practiced the robbery of Mrs. Oliver.

There is something particularly grisly about attacking a very elderly and handicapped woman with bare hands and then beating her with her own cane. Whether or not Pearson or Russell intended to attack her before they entered the house is not

41

dispositive.  Both defendants seem to forget that Pearson told his interrogator that they both beat Mrs. Oliver.  Circumstantial evidence corroborates Pearson's testimony that Russell beat her.  As pointed out several times above, Russell had her blood on his clothes and his shoe, and he left fingerprints inside the house.  There is ample evidence that both defendants engaged in conduct so abhorrent to any fundamental notion of civilized conduct that a life term without parole does not shock the conscience because the punishment is proportionate to their culpability.

## C.  **Equal Protection**

Defendants accurately point out that the Supreme Court in *Graham* and *Miller* analogized life without parole to the death penalty itself.  From this premise, they argue that juveniles exposed to life without parole are similarly situated to adults exposed to execution, and therefore imposition of life without parole, without the benefit of a jury trial as provided to an adult facing capital punishment based on a conviction of first degree murder with special circumstances, denies them equal protection of the law.  That is a leap we do not think the recent Supreme Court cases justify.

In both *Graham* and *Miller*, the Supreme Court likened capital punishment to life without parole for juveniles for the purpose of recognizing the intrinsic value of individualized sentencing.  The court used the analogy to demonstrate that capital punishment for adults and life without parole for juveniles both have grave consequences and support the notion that the most severe sentences should be reserved for the most culpable murderers.  As a result, in both cases the defendants were entitled to a scrupulous examination of their individual culpability given the facts surrounding the commission of their crimes.  But in neither case did the Supreme Court equate death with life in prison for equal protection purposes.

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006)

42

37 Cal.4th 1185, 1199.) There is "no requirement that persons in different circumstances must be treated as if their situations were similar." (*People v. McCain* (1995) 36 Cal.App.4th 817, 819.) If the two groups are not similarly situated for the purpose of the law, we need not analyze the equal protection claim any further. (*In re Jose Z.* (2004) 116 Cal.App.4th 953, 960.)

We agree with the Attorney General that adults facing death and juveniles facing life without parole are not similarly situated because the penalties are not comparable. "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long." (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961].) The death penalty is " 'final' " and " 'irrevocable.' " (*People v. Zimmerman* (1984) 36 Cal.3d 154, 158.) Because juveniles can no longer be executed in the United States (*Roper*, *supra*, 543 U.S. at pp. 568-575 [161 L.Ed.2d at pp. 21-25]), those juveniles convicted of first degree murder with special circumstances are eligible only for life without parole, and therefore they are not similarly situated with adults convicted of the same offense who are eligible for death. Defendants' equal protection claim fails to surmount the threshold requirement of similarly situated groups.

**D.     Fines**

Though we remand this matter for resentencing, we briefly consider two sentencing matters that could arise again. Russell and Pearson were sentenced to indeterminate terms of life without parole for the first degree special-circumstance murder and determinate terms for the burglary and robbery. The trial court appended parole revocation fines pursuant to section 1202.45 to determinate terms stayed under section 654 for each defendant. A parole revocation restitution fine may not be imposed for a term of life without parole. (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) The Attorney General concedes the fines should be stricken because defendants' sentences do not include a period of parole. (*People v. McWhorter* (2009) 47 Cal.4th 318, 380.)

43

The Attorney General, however, is not willing to concede that Pearson should not have to pay a $30 fine pursuant to Government Code section 70373 for each of his offenses. This code section, in pertinent part, provides: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense, including a traffic offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony . . . ." Pearson contends the statute operates prospectively because the statute does not contain a declaration of retroactivity, and since his crimes were committed before the statute took effect on January 1, 2009, he is not subject to the fines.

In *People v. Castillo* (2010) 182 Cal.App.4th 1410, we concluded that the relevant time was the date of conviction, not the date of the commission of the crime. We wrote, "[L]ike the court security fee, the criminal conviction assessment for court facilities was enacted as part of the budgeting process. [Citation.] In [*People v.*] *Alford* [(2007) 42 Cal.4th 749], the California Supreme Court viewed such circumstance as an indication that the court security fee was meant to apply to convictions incurred after its operative date. [Citations.] The same rationale obtains here." (*Castillo*, at p. 1414.) According to *Castillo*, the court properly imposed the conviction assessments against Pearson.

## DISPOSITION

We remand for resentencing in accordance with the principles expressed herein. In all other respects, the judgments are affirmed.

       RAYE       , P. J.

We concur:

     NICHOLSON     , J.


     DUARTE      , J.